**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**2012-1170**

SUPREMA, INC. and MENTALIX, INC.,

*Appellants,*

v.

INTERNATIONAL TRADE COMMISSION,

*Appellee,*

and

CROSS MATCH TECHNOLOGIES, INC.,

*Intervenor.*

---

On Appeal from the United States International Trade Commission in Investigation No. 337-TA-720

---

# [CORRECTED] NON-CONFIDENTIAL REPLY BRIEF OF APPELLANTS SUPREMA, INC. AND MENTALIX, INC.

Darryl M. Woo
Jae Won Song
Ilana S. Rubel
Bryan A. Kohm
David M. Lacy Kusters
Erin Simon
FENWICK & WEST LLP
555 California St., 12th Floor
San Francisco, CA 94104
Telephone: (415) 875-2300
Facsimile: (415) 281-1350

*Attorneys for Appellants*
*SUPREMA, INC. and MENTALIX, INC.*

# CERTIFICATE OF INTEREST

Counsel for the Appellants, Suprema, Inc. and Mentalix, Inc., certifies the following:

1. The full name of every party or amicus represented by me is:

   Suprema, Inc.
   Mentalix, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   As indicated in item 1

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   None.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

| Law Firm | Attorneys |
|---|---|
| Fenwick & West LLP | Darryl M. Woo<br>Heather N. Mewes<br>Jae Won Song<br>Ilana S. Rubel<br>Bryan A. Kohm<br>David M. Lacy Kusters<br>Lauren E. Whittemore<br>Erin Simon<br>Ravi R. Ranganath<br>Clifford Webb |
| Adduci, Mastriani & Schaumberg LLP | V. James Adduci, II<br>Rowan E. Morris<br>Munford Page Hall, II<br>Jonathan J. Engler |

| | |
|---|---|
| | Daniel F. Smith |

Dated: September 21, 2012

By: ______________________
Darryl M. Woo
*Counsel for Appellants*

# TABLE OF CONTENTS

**Page**

[NOTE: This brief contains information that has been determined to be confidential because it relates to the parties' non-public business practices; this information is subject to a protective order. As a result, certain portions of this brief have been designated as confidential. Pursuant to Rule 28(d)(1) of this Court's Rules of Practice, those confidential portions have been removed from this non-confidential version of the brief.]

CERTIFICATE OF INTEREST ........ i

TABLE OF ABBREVIATIONS ........ vii

INTRODUCTION ........ 1

I. The '344 Patent ........ 3

A. Importation ........ 3

1. Cross Match Ignores the Plain Language of Section 337 ........ 4

2. Cross Match Identifies No Precedent Finding a Section 337 Violation from Inducement Alone ........ 5

3. Cross Match Misreads *Certain Electronic Devices* ........ 6

4. Cross Match's Argument About 'Retrospective Application' of *Certain Electronic Devices* Is a Red Herring ........ 8

B. Inducement ........ 9

1. Suprema Did Not Intentionally Aid and Abet Infringement ........ 11

2. Inducement Requires Active Efforts to Avoid Knowledge ........ 13

3. Suprema Took No Action to Avoid Knowledge ........ 15

C. Claim Construction ........ 19

**TABLE OF CONTENTS**
**(Continued)**

**Page**

II. The ’993 Patent ..... 25

A. Claim Construction ..... 25

1. Arguments that an Optical System May Include Non-Lens Elements Are a Red Herring ..... 25

2. Both Objects of the Invention Affirm that the Lens Systems Employ Only Lens Elements ..... 27

3. A Lens System of the Invention Including Non-Lens Elements Runs Contrary to the ’993 Patent’s Teachings ..... 28

4. Appellants Have Not Waived Their Position ..... 29

B. Obviousness ..... 29

1. The ’060 and ’051 Combination Forms a Telecentric Entrance Pupil ..... 29

2. Arguments Regarding Lens 14 Are a Red Herring ..... 30

3. The Motivation to Combine Has Been Clearly Articulated ..... 31

4. Arguments Regarding the Alleged Unsuitability of a Camera Lens Bely Common Sense and the Intrinsic Evidence ..... 32

5. The Combination Discloses All Elements ..... 32

CONCLUSION ..... 33

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**


*Alloc, Inc. v. U.S. Int'l Trade Comm'n*,
342 F.3d 1361 (Fed. Cir. 2003) .....5, 28

*Bicon, Inc. v. Straumann Co.*,
441 F.3d 945 (Fed. Cir. 2006) .....23

*Certain Cardiac Pacemakers and Components Thereof*,
Inv. No. 337-TA-162, 1984 WL 273827, Order No. 37 (March 21, 1984) .....7

*Certain Electronic Devices with Image Processing Systems, Components Thereof, and Associated Software*,
Inv. No. 337-TA-724, Comm'n Op. (Dec. 21, 2011).....6

*DSU Med. Corp. v. JMS Co.*,
471 F.3d 1293 (Fed. Cir. 2006) .....11

*Global-Tech Appliances, Inc. v. SEB S.A.*,
131 S. Ct. 2060 (2011).....*passim*

*Hockerson-Halberstadt v. Avia Group Int'l*,
222 F.3d 951 (Fed. Cir. 2000) .....29

*Hologic, Inc. v. Senorx, Inc.*,
639 F.3d 1329 (Fed. Cir. 2011) .....29

*In re Seagate Tech., LLC*,
497 F.3d 1360 (Fed. Cir. 2007) .....16

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*,
383 F.3d 1337 (Fed. Cir. 2004) .....16, 17, 18

*Kyocera Wireless Corp. v. U.S. Int'l Trade Comm'n*,
545 F.3d 1340 (Fed. Cir. 2008) .....4, 5, 12

*NLRB v. Food Store Emps. Union, Local 347*,
417 U.S. 1 (1974).....8

# TABLE OF AUTHORITIES
**(Continued)**


**Pages(s)**

*Serv. Emps. Int'l Union Local 250, AFL-CIO v. N.L.R.B.*,
640 F.2d 1042 (9th Cir. 1981) ....................8, 9

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
247 F.3d 1316 (Fed. Cir. 2001) ....................*passim*

*Therasense, Inc. v. Becton, Dickinson and Co.*,
593 F.3d 1325 (Fed. Cir. 2010) ....................29

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
520 U.S. 17 (1997)....................23

*Warner-Lambert Co. v. Apotex Corp.*,
316 F.3d 1348 (Fed. Cir. 2003) ....................11

**STATUTES**

19 U.S.C. § 1337(a)(1)(B)(i)....................4

35 U.S.C. § 271(b) ....................6

35 U.S.C. § 271(c) ....................6

**OTHER AUTHORITIES**

*Webster's Third New International Dictionary*....................21

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| ’344 patent | U.S. Patent No. 7,203,344 (asserted patent) |
| ’562 patent | U.S. Patent No. 7,277,562 (asserted patent) |
| ’993 patent | U.S. Patent No. 5,900,993 (asserted patent) |
| ’051 patent | U.S. Patent No. 5,615,051 |
| ’060 patent | U.S. Patent No. 3,619,060 |
| ’440 application | U.S. Patent Application Publication No. US 2007/0014440 |
| ’594 patent | U.S. Patent No. 2,445,594 |
| ’674 application | Japanese Patent Application 09-44674 |
| ’656 patent | U.S. Patent No. 5,963,656 |
| ’949 patent | U.S. Patent No. 5,073,949 |
| ABr | Opening Brief for Appellants Suprema, Inc. and Mentalix, Inc. |
| ALJ | Administrative Law Judge |
| CALJ | Chief Administrative Law Judge |
| CBr | Brief for Intervenor Cross Match Technologies, Inc. |
| Commission | U.S. International Trade Commission |
| Cross Match | Cross Match Technologies, Inc. |
| FID | Final Initial and Recommended Determinations (A000027-207) |
| IBr | Brief of Appellee International Trade Commission |
| Mentalix | Mentalix, Inc. |
| NIST | U.S. National Institute of Standards and Technology |
| Opinion | Commission Opinion (A000209-237) |
| Review Notice | Notice of Commission Decision to Review-in-Part a Final Initial Determination Finding a Violation of |

| | |
|---|---|
| | Section 337; Request for Written Submissions Regarding the Issues Under Review and Remedy, Bonding, and the Public Interest (A000023-026) |
| SDK | Software Development Kit |
| Suprema | Suprema, Inc. |

**INTRODUCTION**

Although Cross Match and the Commission[1] both present Commission precedent stating—in dicta—that a violation of Section 337 may be based on indirect infringement, neither can identify a single instance of *inducement alone* violating Section 337's prohibition on the importation of "articles that infringe." In so doing, they ignore the plain statutory language requiring *importation of an infringing article*; even if Commission precedent did support their view, the Commission cannot enlarge the scope of Section 337. Appellants do not dispute that indirect infringement *premised on the design or functionality* of a product as imported may violate Section 337, but that is not the case here. As the Commission itself found, Suprema's scanners and SDK have substantial non-infringing uses, and thus as imported neither infringe the '344 patent nor violate Section 337.

Appellees' attempts to rehabilitate the Commission's inducement finding also founder for lack of requisite scienter. Although the Supreme Court rejected the previous "deliberate indifference to a known risk" standard for the knowledge element of inducement, Appellees would interpret "willful blindness" as requiring nothing more than inaction. They imply that an inference of willful blindness may be drawn from Suprema's lawful and innocent acts: observing competitor product

[1] For brevity, Cross Match and the Commission, when jointly referenced herein, are referred to as "Appellees."

functionality to better understand the market, researching patents to avoid infringement, and releasing a product without obtaining an opinion of counsel where infringement was not suspected. Appellees ignore the Commission's own finding that Suprema did not incorporate the '344 patent's claimed functionality and that Suprema did not know of that patent, so these acts cannot support copying or inducement. Indeed, as Cross Match acknowledges, the evidence shows that Suprema affirmatively sought to *avoid* adding features that may infringe. Appellees' purported "evidence," as a matter of law cannot support a willful blindness finding.

With regard to the construction of elements (e) and (f) in claim 19 of the '344 patent, Cross Match has caricatured Appellants' argument—that shape detection must at least generally detect a shape—as a hyper-specific requirement to find the "exact contours of the image." (CBr at 10-11.) But, straw man aside, Appellants' construction is both reasonable and correct. The patentee's express distinction between area detection based on a concentration of black pixels, and shape detection based on their oval-like *arrangement*, compels that element (f)'s shape detection cannot be made without regard to the shape in which the concentrated black pixels are arranged. Tellingly, neither of the Appellees even attempts to explain this dispositive distinction.

Appellees' arguments concerning claim construction of the '993 patent misdirect the proper inquiry and misconstrue the specification. They focus on the patent's optical system teachings, but the claim term at issue constitutes part of the lens system, which is the inventive aspect of the patent. As to the objects of the invention, Appellees seek to expand the number of recited objects to avoid the obvious conclusion that all objects of the invention reinforce the proposition that the lens system comprises only lens elements. In fact, only two objects of the invention are recited, and both expressly recite that the lens system uses only lens elements.

Appellees' arguments concerning obviousness of the '993 patent resemble spaghetti on the wall, but none of it sticks. They ask this Court to disregard nearly identical textbook and prior art drawings depicting the configuration of a lens forming a telecentric entrance pupil. They also misdirect the inquiry to the function of lens 14, a lens irrelevant to and not relied on by Appellants. They wrongly assert that no evidence of motivation to combine or suitability of a camera lens exists, yet clear evidence of both exists, even in the intrinsic record.

# I. <u>THE '344 PATENT</u>

## A. <u>Importation</u>

The Commission is not a forum for hearing all accusations of patent infringement occurring in the United States—that responsibility belongs to Article

III courts, which provide procedural and substantive protections not available in Commission proceedings. Rather, Congress gave the Commission power to exclude only "articles that infringe" a valid U.S. patent. 19 U.S.C. § 1337(a)(1)(B)(i). Cross Match would improperly dispense with that statutory limitation, rendering the Commission's jurisdiction co-extensive with federal courts.

#### 1. Cross Match Ignores the Plain Language of Section 337

The Commission's authority stems from Section 337, and any analysis of the statutory prohibition's scope must begin with its text. Yet Cross Match completely ignores the statute. Cross Match cannot—and does not try to— dispute that Section 337 on its face prohibits the importation of *articles that infringe*. As the articles themselves were found non-infringing, at most Suprema has imported "intent," but intent is not an "article." Any Commission precedent inconsistent with the statutory language is not binding on this Court. *See Kyocera Wireless Corp. v. U.S. Int'l Trade Comm'n*, 545 F.3d 1340, 1355 (Fed. Cir. 2008) (in reviewing an agency finding, a court's inquiry must begin with the statute; the Court must, first and foremost, "give effect to the unambiguously expressed intent of Congress.") (citation omitted). Cross Match does not dispute that Appellants' products do not meet this threshold; it concedes that the articles as imported are

capable of substantial non-infringing uses. Under the plain language of Section 337, there is thus no importation violation.

#### 2. Cross Match Identifies No Precedent Finding a Section 337 Violation from Inducement Alone

Appellees cannot identify any case finding a Section 337 violation based on inducement alone; the outcome they seek here would be unprecedented. Cross Match contends that *Kyocera Wireless Corp.* approved the violation finding based on inducement even where the accused products did not infringe as imported (CBr at 42), but this Court *reversed* the Commission's inducement determination based on the importation and sale of baseband processor chips. The Commission found only general intent to cause customers to use the accused products, not specific intent and culpable action to cause infringement. 545 F.3d at 1354. Consistent with *Certain Electronic Devices*, the Commission evaluated inducement at the time of importation and based on the article's characteristics as imported, so the case does not support Cross Match. *Id.* Similarly, in *Alloc, Inc. v. U.S. Int'l Trade Comm'n*, 342 F.3d 1361 (Fed. Cir. 2003), this Court affirmed the Commission's finding of no direct, contributory, or induced infringement, so did not address whether the accused flooring system infringed as imported.

Cross Match marshals dicta from several Commission decisions to suggest that inducement without contributory infringement may violate Section 337. But none of the cited cases actually finds a violation based on inducement alone, nor

have Appellants found any such case. The decisions cited by Cross Match *all* find contributory or direct infringement by the imported article at the time of importation. (*See* CBr at 41-42.)

### 3. Cross Match Misreads *Certain Electronic Devices*

In *Certain Electronic Devices,* a respondent who both imported a device and used it in the United States to commit direct infringement did not violate Section 337 because the device as imported did not infringe. Rather than grapple with this holding and its import to this case, Cross Match resorts to dicta and procedural arguments to disregard the decision. *See* Inv. No. 337-TA-724, Comm'n Op. at 19. The Commission's statements in *Certain Electronic Devices* that section 337 may reach articles involved in "indirect infringement" are entirely reconcilable with Appellants' arguments here: an article may infringe indirectly at the time of importation if it is "especially adapted for use in an infringement . . . and not a staple article or commodity of commerce suitable for substantial noninfringing use," in which case the act of importation may also constitute inducement of infringement. *See* 35 U.S.C. § 271(b)-(c). Recognizing that the Commission's authority over infringing articles extends only to articles that infringe as imported does not conflate contributory infringement with inducement or eliminate inducement from section 337.

Although *Certain Electronic Devices* expressly overruled cases using the "nexus" language, its decision was consistent with the Commission's prior treatment of the importation requirement. For example, in *Certain Cardiac Pacemakers and Components Thereof*, Inv. No. 337-TA-162, 1984 WL 273827, Order No. 37 (March 21, 1984), respondent Cordis manufactured its accused pacemaker in the United States, but incorporated two minor components that were manufactured abroad. As components rather than complete pacemakers, they did not read on every element of any claim, hence did not directly infringe. *Id.* at *2. Nor did the importation of the components constitute contributory or induced infringement, because they were "interchangeable, staple items that are used in several non-infringing applications." *Id.* Given that the only imported components of the accused product did not infringe, the ALJ held that "the evidence now establishes that Cordis has committed no unfair acts within the meaning of § 337. No nexus can be established between the importation and the alleged infringement; consequently, the Commission cannot find a violation of the statute and lacks jurisdiction to issue a remedy." *Id.*; *see also Certain Cardiac Pacemakers*, Inv. No. 337-TA-162, 1984 WL 273844, at *2, Order No. 64 (June 29, 1984) (granting summary determination of no violation to another respondent, "because there exists no contributory infringement or inducement to infringe in the importation of

[the component integrated circuits], any direct infringement by the [accused pacemaker] is not an unfair act cognizable under section 337.").

### 4. Cross Match's Argument About 'Retrospective Application' of *Certain Electronic Devices* Is a Red Herring

To recognize the limitation of Commission authority over "articles that infringe," based on the text of Section 337 and the Commission's own interpretation in *Certain Electronic Devices*, would not be impermissibly "retrospective," as Cross Match argues. (CBr at 42-43.) Cross Match relies on a footnote in *NLRB v. Food Store Emps. Union, Local 347*, 417 U.S. 1, 10 n.10 (1974) to argue for remand in lieu of reversal, but that case dealt with an appellate court's enlargement of remedies, not its interpretation of the scope of a statutory prohibition. *Id.* at 9-10. As the Ninth Circuit subsequently explained, "*Food Store Employees* establishes that a court should defer to the Board in fashioning remedies for unfair labor practices. This is analytically distinct from deciding that a stipulated set of facts does not constitute a violation of a statute such as section 8(a)(3)." *Serv. Emps. Int'l Union Local 250, AFL-CIO v. N.L.R.B.*, 640 F.2d 1042, 1046 (9th Cir. 1981). In *Food Store Employees*, the reviewing court subverted the "orderly function of the process of judicial review" by itself exercising the "broad discretion to fashion remedies" that Congress entrusted to the National Labor Relations Board. 417 U.S. at 9-10. Here, this Court is not called upon to review the Commission's fact-based choice among various remedies. Rather, the issue in

this appeal is whether there has been a statutory violation that would merit any remedy at all. Deciding that a statute is inapplicable "is within the province of the judiciary in our system of separate powers." *Serv. Employees Int'l Union Local 250,* 640 F.2d at 1046. The limitations of Section 337 is a legal question for judicial review, not remand.

Applying the reasoning of *Certain Electronic Devices* to this case is not a "retroactive" application of its doctrine, even assuming the cases Cross Match cites were applicable. And as discussed, they are not. This Court has not yet interpreted Section 337's applicability to pure inducement claims; it has the power to do so, and should adhere to the statute's requirement that the article itself infringe at the time of importation.

**B. <u>Inducement</u>**

The Commission contends that Suprema induced Mentalix's infringement by "ensur[ing] that the Suprema scanners imported by Mentalix would function with Mentalix's proprietary software, *i.e.* FedSubmit, ***to perform the recited features of claim 19 of the '344 patent***." (*See* IBr at 39 (emphasis added).) However, nothing cited by Appellees actually supports this contention. Appellees cite no evidence that (1) Suprema had knowledge of the '344 patent prior to Cross Match's complaint (a predicate to the Commission's claim that Suprema intended that Mentalix perform the '344 patent steps); or (2) Suprema took any steps that

could conceivably constitute "aided and abetting" any purported infringement by Mentalix.

Unable to show actual knowledge of the patent, Appellees instead urge a low bar for "willful blindness," advocating a standard that not only contravenes the clear instruction of *Global-Tech*, but also creates a Catch-22 for any manufacturer, seller, or importer of products. The very steps a manufacturer might take to *avoid* infringement—looking for potentially relevant patents and foregoing particular features in order to steer clear of a particular patent—will be used as evidence of intent to infringe. A plaintiff can always cite some step the defendant did not take that might hypothetically have unearthed the patent-in-suit; that next, untaken step cannot substitute for actual knowledge of the asserted patent. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068-70 (2011) (rejecting previous "knew or should have known" standard for "knowledge that the induced acts constitute patent infringement"). As persuasively explained in the brief of *amicus curiae* Google Inc., "the decision not to seek out every potentially relevant patent is not only reasonable but perhaps even the only feasible choice," given the vast number of patents that might read on a particular product, the unpredictability of claim construction, and the complex, fact-intensive nature of infringement determinations. (Google Br. at 15, 18-20.) Cross Match wholly fails to address—

much less justify—the tremendous burden its standard would impose on legitimate commerce.

### 1. Suprema Did Not Intentionally Aid and Abet Infringement

Appellees wrongly contend that Appellants "concede" that Suprema intentionally aided and abetted infringement. In their opening brief, Appellants focused on lack of knowledge of the '344 patent but did not concede any other element of inducement. Indeed, without knowledge of the '344 patent, Suprema *could not* have formed the necessary intent to induce infringement of it.[2] *See Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1364 (Fed. Cir. 2003) (inducement requires specific intent to cause infringement). When the Commission's erroneous finding of knowledge is corrected, its finding of intent necessarily collapses. The record also independently establishes that Suprema lacked the requisite intent.

The record evidence attests that Suprema's only "intent" was to supply customers, including Mentalix, with a high-quality live scanner and SDK—not to cause infringement. *See DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (the intent necessary to infringe is the intent to cause *infringement* as

[2] Cross Match contends Suprema learned of the '344 patent through Cross Match's February 2010 complaint filed in district court (CBr at 35). However, Cross Match does not dispute that all allegedly inducing acts took place well before then, so Suprema could not have knowingly induced infringement at that time. *See, e.g.*, *Global-Tech*, 131 S. Ct. at 2065-68 (knowledge must exist at the time of inducement).

distinct from *acts* alleged to constitute infringement); *Kyocera* (vacating and remanding inducement finding where the evidence established only intent to sell an allegedly-infringing product). This Court has previously reversed a Commission finding of inducement premised on very similar evidence: "the ITC's conclusion that 'Qualcomm intends to induce infringement because it provides its customers with the system determination code' evinces, at most, a finding that Qualcomm generally intended to cause acts that produced infringement." *Kyocera*, 545 F.3d at 1354.

Here, too, Suprema merely sold a product to customers and helped them use it. Suprema gave the same SDK and sample source code to all its customers to assist them in interfacing their own software with Suprema's scanners. (*See, e.g.*, A303017-18 ([[ ,]] providing SDKs); A303019 ([[ ,]] sending demonstration code); A303020 ([[ ,]] attaching SDK); A305570 **([[** ,]] discussing SDK).) Four of the five Suprema customers whose software was at issue in this investigation were not found to infringe. (A000134.) Suprema took the same actions to help the four undeniably non-infringing customers as it did the single customer whose software was found to infringe. The only reasonable conclusion to draw from this fact is that Suprema

at most intended to sell its (non-infringing) product and enable customers to use it. The Commission's finding of intent to induce is unsupported by this evidence.[3]

If every sale of a product that could be used to infringe—and that also has substantial non-infringing uses—was an act of inducement, the doctrine would envelop a wide array of legitimate commerce. Suprema's products can be and are widely used in non-infringing ways. (A000119, A000133-134.) Suprema's mere encouragement to customers to buy and use its products thus does not inexorably result in infringement. On this record, the finding of inducement cannot stand as a matter of law.

### 2. Inducement Requires Active Efforts to Avoid Knowledge

Although Cross Match quotes the Supreme Court's standard for willful blindness, the second element of which requires that the defendant take "deliberate actions," it nevertheless contends that Suprema's mere *in*action can suffice. (CBr at 31-33.) The Supreme Court, however, rejected the prior "deliberate indifference" standard precisely because it "does not require active efforts by an inducer to avoid knowing about the infringing nature of the activities." *Global-Tech*, 131 S. Ct. at 2071.

[3] The Commission cites a laundry list of purported "evidence" of Suprema's "encouragement or aiding and abetting" of Mentalix's alleged infringement. (*See* IBr at 38-40.) The cited exhibits show merely that Suprema provided Mentalix with its scanners and SDK (neither of which were found to practice the claims of the '344 patent), just as Suprema did for any customer.

*Global-Tech* was premised on active efforts designed to obscure a high likelihood of infringement: the defendant intentionally sought out a product manufactured overseas because it knew it was unlikely to bear U.S. patent markings; defendant copied "all but the cosmetic features;" and it affirmatively misinformed its attorney about the nature of its product in order to "manufacture a claim of plausible deniability." *Id.* These are not mere inactions and the defendant did not merely fail to consult an attorney. These affirmative acts evinced the culpable knowledge of one "who can almost be said to have actually known the critical facts." *Id.* at 2070-71. *Global-Tech* does not permit a finding of willful blindness absent such deliberate culpable actions.

Cross Match's offhand argument that this Court can affirm the Commission's finding of willful blindness based solely on evidence reflecting wholly innocent acts by Suprema would similarly subvert *Global-Tech*. Unrebutted evidence directly establishes that Suprema did not follow the attenuated chain from the '562 patent's incorporation by reference. (A200330 at 1143:18-1144:5; A200331 at 1145:17-1146:3, 1146:4-1147:4.) Facts that do not rise to the level of willful blindness necessarily do not show actual knowledge; willful blindness exists to address those situations where a defendant "can almost be said to have actually known the critical facts." *See Global-Tech*, 131 S. Ct. at

2070-71. To treat a lesser factual showing as circumstantial evidence of actual knowledge instead would expand the exception to swallow the rule.

### 3. Suprema Took No Action to Avoid Knowledge

In seeking to force the square peg of Suprema's conduct into the round hole of *Global-Tech*, Appellees perversely treat Suprema's efforts to *avoid* infringement as evidence of intent to *cause* infringement. That Suprema investigated whether any patents might read on its planned product is the kind of effort to *avoid* infringement that the patent law should welcome, not punish. That Suprema, when selecting product features, opted against adding real-time quality feedback in order to give the '562 patent a wide berth, cannot be intent to infringe the '562, much less the then unknown '344 patent!

Equally non-nefarious is Suprema's investigation of the feature offerings of [[ ,]] so as to understand the relevant market. (CBr at 11-12, 33-34; IBr at 22-23.) Without knowledge of the '344 patent, this is simply ordinary business practice, not evidence of intent to induce infringement. That Suprema engineers sought to offer the same level of "configuration" options as Cross Match speaks only to the number of customer-adjustable parameters in Suprema's scanners, not any aspect of patented functionality. (IBr at 23.)

In a further effort to contort *Global-Tech*'s intent threshold, Appellees argue that the absence of an action is itself a deliberate action. But this approach obliterates the Supreme Court's express distinction between the previous "deliberate indifference" standard—which did not require "active efforts" to avoid knowledge—and willful blindness. 131 S. Ct. at 2071. Appellees fault Suprema for not consulting a lawyer, something it had no obligation to do. (CBr at 36-37; IBr at 26.) Appellees' analogy to *Global-Tech* here is unavailing; defendant there did not merely fail to secure a clearance opinion, but deliberately sought an opinion while misinforming its attorney. 131 S. Ct. at 2064. That is far from Suprema's mere inaction of not consulting a lawyer. The Commission takes this argument still further, asserting that Suprema should have obtained an opinion of counsel generally, not merely as to the non-infringed '562 patent. Such an untethered duty for every manufacturer to consult a lawyer before selling a product is exactly the exorbitant and commerce-stifling requirement rejected in *Seagate* and *Knorr-Bremse*. *In re Seagate Tech., LLC,* 497 F.3d 1360, 1371 (Fed. Cir. 2007) ("we also reemphasize that there is no affirmative obligation to obtain opinion of counsel"); *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.,* 383 F.3d 1337, 1345-46 (Fed. Cir. 2004).

Appellees emphasize that Suprema "researched CMT products and patents," falsely implying that it *copied* Cross Match's products and patents, potentially

triggering a duty to investigate whether Cross Match's product was patented. But, the undisputed evidence (summarized in ABr at 11-13) and the Commission's own non-infringement findings squarely rule out copying of patented functionality by Suprema.

The Commission examined Suprema's SDK and determined that Suprema's software does not practice any claim of the '344 or the '562 patent either standing alone or when incorporated into the software of any customer but Mentalix. The Commission specifically found that Suprema's products have substantial non-infringing uses. That Suprema's products are widely used without performing the claimed steps of the '344 patent underscores that Suprema did not copy any patented functionality.

Further, undisputed evidence established that Suprema did not, and *could not* have, copied the patented features of Cross Match's products. Although Suprema had access to Complainant's SDK, this is object code, which would not reveal "things like algorithm or internal operations." (A200329 at 1138:25-1139:6.) Suprema thus could not have copied the patented aspect of Cross Match's products; namely, the precise sequence of steps recited in claim 19. *See id.* Further, Mr. Song expressly testified that Suprema did not copy Cross Match's products: "Q . . . Has Suprema ever copied the source code or functionality of another product? A. It has not." (A200332 at 1149:20-22.) Cross Match has

offered no rebuttal or countering evidence. The Commission's finding of copying thus contradicts the undisputed record. Suprema merely used competitors' products as benchmarks to guide its own independent development, to ensure that its products would have comparable features like resolution, size, weight, and the like. (A200329 at 1138:3-17; A303829-30 at 129:21-131:17; *see also* A303261-A303272.)

The Commission asserts that "Suprema succeeded in developing into its scanners the autocapture, image quality checking, and automatic segmentation processes that are covered by the '344 patent," but the evidence cited for this proposition shows only Suprema's use of the word "autocapture." (IBr at 23 (citing A300031-32; A303233-34; A303754-55:9-13, A303763:42-43).) As its own expert acknowledged, Cross Match did not invent and holds no monopoly on the concept of "autocapture." (A200271 at 906:3-8, 11-15.) One can perform "autocapture" without performing the method claimed in the '344 and '562 patents (*id.*), and the Commission found that Suprema's products do exactly that, finding that Suprema's products, standing alone, do not infringe any claim of the '344 or '562 patents. Thus, the implication that Suprema copied patented features of Cross Match's products is not only utterly without evidentiary support but, in fact, foreclosed by the record and the Commission's own findings.

Cross Match presents an array of innocent behavior on Suprema's part, tries to imbue it with suspicious undertones, and pass it off as a legitimate foundation for a finding of intent to induce. It is not. Observing features in a publicly available competitor's product, reviewing a patent and modifying one's own offerings *so as to avoid infringement*, and releasing a product with substantial non-infringing uses without soliciting a costly opinion of counsel where no infringement is suspected—taken together or separately, do not support "willful blindness" as a matter of law.

### C. Claim Construction

Faced with claim language that unambiguously states that area detection is "based on" one thing while shape detection is "based on" another, Cross Match simply denies that the claim says what it says: "Appellants point to nothing—and there is nothing—that requires separate *inputs* to detect area and shape." (CBr at 23.) That "nothing" is the very claim language at issue:

> (e) detecting a fingerprint area ***based on a concentration of black pixels*** in the binarized fingerprint image;
>
> (f) detecting a fingerprint shape ***based on an arrangement of the concentrated black pixels in an oval-like shape*** in the binarized fingerprint image; and

(A000297 at 19:31-35 (emphasis added).) "Absolute Precision" (CBr at 17) has never been Suprema's position as to what shape detection requires—this is a notion constructed entirely by Cross Match. A person of ordinary skill in the art

might choose various approaches to determining the shape of a concentration of black pixels without needing such precision. (A200437; A200454; A200485; A302033-039; A302358-384.) Rather, the parties dispute whether actual shape of the image, as opposed to dimensions of the bounding box around it, has any role in the claim 19 detection of fingerprint shape. The patentee unambiguously answered the question: the shape of the concentrated black pixels must inform shape detection, because shape detection, unlike its sibling, area detection, must be based on the "arrangement" of pixels "in an oval-like shape". Appellees make no attempt to explain why shape detection is based on such arrangement, while area detection is not.

Appellees ask the Court not only to disregard the patent's crucial distinction between "a concentration of black pixels" and "an arrangement of the concentrated black pixels in an oval-like shape," but to dispense altogether with the universally understood concept of shape.





Anyone, whether a biometric software developer or a pre-schooler, would say that the shapes of the above objects are, respectively, of a boat and a tree. Conversely, nobody would describe these image shapes as "boxes with a "2:3 width:height

ratio." Yet that is what Cross Match asks this Court to accept as the plain meaning of "shape"—Cross Match essentially seeks to replace the common sense understanding—meaning at least the general contour of an image[4]—with "ratio of width to height of the image." (CBr at 23.) Whether construing shape according to norms of the English language, context within the patent, or meaning to one of ordinary skill in the art, Cross Match's proposed construction is simply wrong.

There is a practical explanation for the claim's requirement of detection of the shape of the pixels' arrangement. When an image is captured, it may contain many concentrations of pixels, and only some are fingerprints. To know which particular pixel concentrations are the fingerprint shapes, the arrangement is relevant:




---

[4] According to *Webster's Third New International Dictionary*, cited by the CALJ throughout the FID (*see, e.g.*, A000074, A000082, A000084, A000088), shape means "spatial form or contour." Appellants are aware of no authority for the notion of shape as height:width ratio. (*See* CBr at 23.)

(A302881.) In context of the specification, the purpose is to isolate fingerprints, as opposed to other blobs perhaps representative of other finger parts, by discerning those images that are ovals and hence most likely to be the fingerprint-containing fingertips. The claim would be pointless if it merely described indiscriminately detecting any and all images on a platen, some of which may incidentally be oval-like. *Because* "[t]he fingerprint shapes can be oval-like shapes," the "fingerprint shape detection step detects the areas concentrated by black pixels that are comprised of oval-like shapes." (A000295 at 15:47-49.)

In arguing that the arrangement of black pixels is irrelevant to step (f), the Commission quotes a portion of the specification, but that statement actually supports Appellants' construction: Whereas "the detection step detects the areas concentrated by black pixels," the "fingerprint shape detection step detects the areas concentrated by black pixels *that are comprised of oval-like shapes*." (CBr at 49; A000295 at 15:43-49 (emphasis added).) Whereas any concentration of black pixels may satisfy element (e), element (f) detects only those concentrations that are oval-shaped, not any other concentration. Element (e) casts a wide net, and element (f) pares that selection down, requiring a detection method that actually discerns ovals.

In Cross Match's view, the processing software can identify which concentrations of black pixels are fingerprints in a manner not specified in the

patent. It then detects their area and shape, and if any of the fingerprint shapes *happen to* be oval-like, there is infringement. But that is not the teaching of the ’344 patent. There would be no reason to specify that fingerprint detection is based on oval-shaped pixel arrangement if that arrangement were merely incidental to the detection. The detection of fingerprint shapes must be “based on an ***arrangement*** of the concentrated black pixels” and that arrangement is specifically oval-like. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997) (“Each element contained in a patent claim is deemed material to defining the scope of the patented invention . . . .”); *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) (claims should be interpreted “with an eye toward giving effect to all terms in the claim”); *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1325 (Fed. Cir. 2001) (rejecting construction that would render phrase in claim “mere surplusage”).

The Commission disputes that the CALJ applied different constructions to infringement and invalidity in a single, conclusory sentence citing to the CALJ’s express construction. But the Commission fails to examine the CALJ’s application of that construction to the prior art, which was significantly and improperly more restrictive than the manner in which he applied his construction to Appellants’ products. Like the accused products, the prior art ’949 patent identifies the top-most and bottom-most boundaries of a concentration of black pixels: “the

separating point yt which separates the fingers Fa and Fb is computed in accordance with a y coordinate of the minimum value (step 35)." (A302008, figs. 4A, 4B; A302017 at 6:23-26.) Like the accused products, the prior art identifies the left-most and right-most boundaries of that concentration: "sum signals of pixel densities in the y direction for the finger images fa and fb are generated in accordance with the separating point yt. Therefore, the feature data Aa(y) for the forefinger Fa is generated (step 37), as shown in FIG. 4C, and the feature data Ab(y) for the middle finger Fb is generated, as shown in FIG. 4D (step 39)." (A302017 at 6:31-37.) If the CALJ had used the same construction for both infringement and invalidity, he would have found shape detection in the prior art. That he did not is further evidence of the error of his construction.

Contrary to the Commission's argument, Appellants are not attempting to construe the claims by reference to the accused devices. Appellants' construction of this claim does nothing more than heed its plain language and defer to the import intended by the patentee—that shape means shape, and that a detection "based on an arrangement" must take the shape into account when making a detection.

# II. THE '993 PATENT

## A. Claim Construction

### 1. Arguments that an Optical System May Include Non-Lens Elements Are a Red Herring

Appellees' focus on the "optical system" limitation recited in the preamble is misplaced. The fact that an optical system may comprise non-lens elements is not probative of whether the '993 patent teaches that the *lens system* of the invention excludes such elements.

No dispute exists that claim 10 is directed to an optical system—in this case, a prism, element 10(a), together with a lens system, elements 10(b)-(e). Nor is there a dispute that an optical system may employ non-lens elements. But the inventive aspect of the patent "relates to lens systems." (A000257 at 1:5-6.) As the Background of the Invention evidences, fingerprint detection optical systems employing prisms capable of frustrated total internal reflection were well known in the art. (*Id*. at 1:9-44.) Those optical systems combined such a prism with various forms of lens systems. (*Id*.)

The '993 patent teaches that its invention is different from the prior art optical systems by virtue of the lens system it employs. This is reinforced through the patent (all emphasis added):

- Title: "*Lens Systems* for Use in Fingerprint Detection"
- Abstract: "*Lens systems* for use in fingerprint detection systems . . ."
- Field of the Invention: "The invention relates to *lens systems* . . ." (*Id.*

at 1:5)

- Description of the Invention:
  - "it is an object of the invention to provide improved *lens systems* for use in fingerprint detection" (*Id.* at 1:46-48)
  - "it is an object of the invention to provide *lens systems* which employ only lens elements and do not employ distortion correcting prisms, holographic optical elements, or off-axis optics" (*Id.* at 1:47-51)
  - "A further object of the invention is to provide inexpensive *lens systems* for use in fingerprint detection systems." (*Id.* at 1:52-53)
  - "it is an object of the invention to provide *lens systems* for use in fingerprint detection which comprise molded lens elements" (*Id.* at 1:53-57)

Whether the patentee has disclaimed non-lens elements from an optical system is thus immaterial.[5] Instead, the proper inquiry must focus on lens systems. The claim limitation at issue, element 10(d), is part of the lens system, which is made of "an aperture stop and three lens units"—elements 10(b)-(e). (A000247 at Abstract; A000257 at 1:5-7 (invention relates to lens system in combination with prism).) As set forth in Appellants' opening brief, the '993 patent consistently reinforces that the lens system employs only lens elements.

[5] To be clear, Appellants agree that the optical system may contain non-lens elements outside the lens system—for example, between the prism (itself a non-lens element) and the first lens unit.

### 2. Both Objects of the Invention Affirm that the Lens Systems Employ Only Lens Elements

The Commission's argument that only one of four objects of the invention supports Appellants' position misinterprets the specification. First, the patent discloses only two objects of the invention; the patent recites two general objects and then provides more specificity as to what those are.[6] (A000257 at 1:46-57; *see* Section III.A.1 above.) Both, however, support the proposition that the lens systems employ only lens elements. No dispute exists that the first object supports this proposition. (*Id.* at 1:48-50.) The second object, in turn, aims to provide lens systems that comprise molded lens elements. (*Id.* at 1:52-57.) Molded *lens elements* obviously are not non-lens elements. The use of "comprise" in the second object is not surprising, as the lens system also necessarily includes an aperture stop.

The specification expressly states that limitation 10(d) at issue achieves these objectives, not just one of them. Specifically, it states "[t]o achieve ***these*** and other objects, the invention in accordance with a first of its aspects provides" and

---

[6] The use of "[i]n particular" as an introductory clause for the alleged second and fourth recited objects demonstrates that those are merely more particular recitations of the preceding objects. (A000257 at 1:48, 1:53-54.) Appellees apparently desire to expand the number of objects to four to escape the obvious fact that all objects exclude the use of non-lens elements.

proceeds to list various elements, including limitation 10(d).[7] (*Id.* at 1:58-2:18 (emphasis added).) Limitation 10(d) should thus be construed according to these teachings, which provide that the lens system comprising three lens units and an aperture stop cannot contain non-lens elements. *See Alloc, Inc. v. U.S. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) (construing limitation to include "play" where the object of the invention called for a system feature displacement "facilitated by play"). There thus cannot be non-lens elements inside that lens system, including between the second lens unit and the aperture stop.

### 3. A Lens System of the Invention Including Non-Lens Elements Runs Contrary to the '993 Patent's Teachings

The position that the lens system can include non-lens elements so long as they are not part of the three lens units would render the teachings in the specification nonsense. If only lenses constituted part of the lens system, all lens systems would necessarily comprise only lens elements. But the specification teaches that such a configuration is not the norm, and indeed the inventive aspect of the patent is a lens system comprising only lens elements.

[7] The specification later recites another set of elements that are identical to claim 10, but limitations (d) of both sets of elements, as well as limitation 10(d), are identical and thus should be construed the same.

#### 4. Appellants Have Not Waived Their Position

Last, contrary to the Commission's suggestion, Appellants have not waived their position regarding limitation 10(d). That limitation and position were subjects of their petition for review. (*See* A102618, A102659.)

### B. Obviousness

#### 1. The '060 and '051 Combination Forms a Telecentric Entrance Pupil

Appellants have provided clear and convincing evidence that the first lens unit of the combination forms a telecentric entrance pupil.

The parties agree that a lens forms a telecentric entrance pupil when the aperture is placed at the focal point. The figures and text of the '060 patent disclose this configuration. The Commission's argument that it is inappropriate to rely on Figure 1 fails. The cited authorities do not support the broad proposition that a figure cannot constitute disclosure of a claim element. (*See* IBr at 62.) Those cases stand merely for the propositions that drawings, alone, cannot constitute disclosures of "precise proportions" or asymmetry of elements (also proportions) because they are not intended to be drawn to scale. *See Hockerson-Halberstadt v. Avia Group Int'l,* 222 F.3d 951, 956 (Fed. Cir. 2000); *Hologic, Inc. v. Senorx, Inc.*, 639 F.3d 1329, 1338-39 (Fed. Cir. 2011). Here, in contrast, Figure 1 depicts the configuration of the system. Precedent allows the use of figures for this purpose. *See, e.g., Therasense, Inc. v. Becton, Dickinson and Co.*, 593 F.3d

1325, 1335 (Fed. Cir. 2010) (finding patent invalid based on configuration of components disclosed in figures of prior art reference).

Figure 1 is literally a textbook depiction of a lens forming a telecentric entrance pupil.




(A302501)




(A302023)

The arguments attempting to distinguish the textbook's teaching of placing the aperture stop "at the focal point" and the '060 patent's statement that "lens 28 focuses the light through diaphragm 30 onto an inclined focal plane" are not supported by the evidence. As shown in each of the prior art depictions of a telecentric lens, the light rays focus through the aperture/diaphragm to form an image on the other side. (*See* ABr at 57.) The '060 patent depicts and describes the same configuration.

### 2. Arguments Regarding Lens 14 Are a Red Herring

Arguments concerning lens 14 of the '060 patent should be disregarded. Appellants are not relying on lens 14, nor is that lens relevant in determining whether lens 28 forms a telecentric entrance pupil. The apparent import of the

arguments is that because lens 14 creates parallel rays, the parallel rays shown in front of lens 28 must be caused by lens 14 and do not indicate a telecentric condition of lens 28. No support exists for this proposition, and indeed the specification teaches otherwise. The ’060 patent teaches that the prism “scatters” the parallel light source (lens 14), and thus the reflected light rays reaching lens 28 would be scattered, not parallel. (A302026 at1:60-66.) In any event, the telecentric condition is expressed via lens 28, which is passive, and the position of the aperture stop relative to it, not lens 14. (A302023.)

### 3. The Motivation to Combine Has Been Clearly Articulated

Rather than addressing the evidence of record, Appellees simply argue that no evidence of a motivation to combine exists. To the contrary, the ’060 patent ***expressly teaches*** that an achromatic lens[8] must be used in the system but fails to provide the constructional data for the lens. (A302027, 3:38-40.) The ’051 patent, in turn, discloses the constructional data for an achromatic lens. (A200365, 1280:3-1281:19.) It is hard to contemplate a more express teaching of a motivation to combine.

[8] The Commission suggests that the ’051 patent does not disclose a lens but instead lenses. A lens can comprise multiple lens elements (or lenses), as evidenced by the claims of the of the ’051 patent which refer to the triplet as a lens. *See, e.g.*, A302003 at 9:25, 9:27, A302004 at 12:12.

### 4. Arguments Regarding the Alleged Unsuitability of a Camera Lens Bely Common Sense and the Intrinsic Evidence

The arguments that no evidence suggests a camera lens would be suitable for a fingerprint detection system defy common sense and the intrinsic evidence. The goal of both a fingerprint system and camera is to take a picture of an object—in fact, both can take a picture of a finger. The light must be focused onto a flat a surface (old cameras used film; modern ones use flat image sensors) such that it produces a sharp image. In fact, Bahuguna, addressed in the background section, shows that "typical fingerprint sensor[s]" employ a CCD ***camera*** to capture a fingerprint image.



Fig. 1. Typical fingerprint sensor that uses a prism.

(A302952, Fig. 1.)

### 5. The Combination Discloses All Elements

Cross Match wrongly argues that the '060 and '051 combination does not disclose all elements. A recitation of the elements was provided in Appellants' opening brief at pages 60-67 and is contained in the record at A200363-A200365.

**CONCLUSION**

This Court should reverse the Commission's findings that (i) claim 19 of the '344 patent is valid and infringed; (ii) Suprema induced that infringement; (iii) such purported infringement violated section 337; and (iv) the '993 patent is valid and infringed.

Dated: September 21, 2012

Respectfully submitted,

Darryl M. Woo
Ilana Rubel
Bryan A. Kohm
David M. Lacy Kusters
Erin Simon
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone:(415) 875-2300
Facsimile: (415) 281-1350

Jae Won Song
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Telephone: (650) 988-8500
Facsimile: (650) 938-5200

Attorneys for Appellants
*Suprema, Inc. and Mentalix, Inc.*

## CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS WITH FRAP 32(a)(7)(B)

1. This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B).

√ This brief contains 6,993 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

√ The brief has been prepared in a proportionally spaced typeface using Microsoft Office Word Version 2007, in 14pt., Times New Roman.

(Signature of Attorney)

Darryl M. Woo
(Name of Attorney)

Defendant-Appellant
(State whether representing appellant, appellee, etc)

September 21, 2012
(Date)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that an original and five (5) copies of the foregoing **NON-CONFIDENTIAL REPLY BRIEF OF APPELLANTS SUPREMA, INC. AND MENTALIX, INC.** to be dispatched via FederalExpress Overnight Delivery for filing with the court at the following address:

Clerk of the Court
United States Court of Appeals for the Federal Circuit
717 Madison Place, NW
Washington, DC 20439

and two (2) copies were served via FederalExpress Overnight Delivery to the following parties:

| | |
|---|---|
| Maximillian A. Grant<br>Latham & Watkins LLP<br>555 Eleventh Street, NW, Ste. 1000<br>Washington, DC 20004-1304<br>max.grant@lw.com<br>Fax: (202) 637-2201 | Clement Naples<br>Latham & Watkins LLP<br>885 Third Avenue, Suite 1000<br>New York, NY 10022-4802<br>clement.naples@lw.com<br>Fax: (212) 751-4864 |
| Clint Gerdine (clint.gerdine@usitc.gov )<br>Andrea Casson (andrea.casson@usitc.gov)<br>Dominic L. Bianchi<br>(dominic.bianchi@usitc.gov)<br>Office of General Counsel<br>U.S. International Trade Commission<br>500 E Street, SW, Suite 707<br>Washington, DC 20436<br>Fax: (202) 205-3111 | |

Dated: September 21, 2012 By: ______________________
Aurelia Nolen