2012-1170

NON-CONFIDENTIAL

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

SUPREMA, INC. AND MENTALIX, INC.,

Appellants,

v.

INTERNATIONAL TRADE COMMISSION,

Appellee,

and

CROSS MATCH TECHNOLOGIES, INC.,

Intervenor.

On appeal from the United States International Trade Commission in Investigation No. 337-TA-720.

# NON-CONFIDENTIAL EN BANC BRIEF OF APPELLEE INTERNATIONAL TRADE COMMISSION

DOMINIC L. BIANCHI
General Counsel
Telephone (202) 205-3061

WAYNE W. HERRINGTON
Assistant General Counsel
Telephone (202) 205-3090

CLARK S. CHENEY
Attorney for Appellee
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone (202) 205-2661

The material redacted from pages 8, 14, 15, 39, 40, 43 46, 47, 49, 50, 56, 57, and 60 of the Commission's non-confidential brief was designated as confidential business information during the investigation under appeal and was granted confidential treatment by the Commission. *See* 19 U.S.C. § 1337(n); *see also* 19 C.F.R. § 210.5.

## TABLE OF CONTENTS

Page(s)


TABLE OF CONTENTS .......... i
TABLE OF AUTHORITIES .......... iv
TABLE OF ABBREVIATIONS .......... xi
STATEMENT OF RELATED CASES .......... 1
STATEMENT OF JURISDICTION .......... 2
STATEMENT OF ISSUES .......... 3
STATEMENT OF THE CASE .......... 4
A. The Trade Investigation at Issue .......... 4
B. U.S. Patent No. 7,203,344 .......... 5
C. U.S. Patent No. 5,900,993 .......... 7
D. Suprema and Mentalix .......... 7
E. The ALJ's Initial Determination .......... 8
F. The Commission's Final Determination .......... 9
SUMMARY OF THE ARGUMENT .......... 12
ARGUMENT .......... 18
I. Standard of Review .......... 18
II. Violation Based on Articles that Infringe the '344 Patent .......... 19
A. Section 337 Covers Importation of Articles that Infringe under 35 U.S.C. § 271(b) .......... 20
1. Inducement under § 271(b) Is Infringement .......... 20
2. Infringement under § 271(b) Is Often Tied to Articles .......... 22

## TABLE OF CONTENTS CONT'D


3. Supplying a "Staple Article" Can Give Rise to Liability Under § 271(b) ....27

4. Historically, Section 337 Included Liability for Articles Imported to Induce Infringement ....28

5. Appellants Confuse Violation with Remedy ....33

6. Appellants Misrepresent the Commission's Decision in *Electronic Devices* ....35

B. The Record Shows Infringement at the Time of Importation ....38

C. The Commission's Willful Blindness Determination Is Correct ....42

1. Failing to Investigate a Known Risk Is a Deliberate Action to Avoid Knowledge ....44

2. The Commission Appropriately Examined Suprema's Failure to Consult with Outside Counsel among Other Circumstances ....47

3. The Commission Did Not Apply a Negligence Standard ....50

D. The Commission Correctly Construed Claim 19 ....51

1. "Detecting a Fingerprint Area" Does Not Require a Mathematical Calculation of Area ....52

2. "Detecting a Fingerprint Shape" Does Not Require a Mathematical Calculation of an Oval ....53

E. Elements (e) and (f) of Claim 19 Read on the Method Performed by Mentalix Using the Accused Devices ....55

1. The FedSubmit Software Has Functions for "Detecting a Fingerprint Area" ....56

2. The FedSubmit Software Has Functions for "Detecting a Fingerprint Shape" ....56

III. Violation Based on Articles that Infringe the '993 Patent ....57

IV. The Commission's Remedy Bears a Reasonable Relation to Appellants' Violation and Should Be Affirmed ....58

A. History Shows Customs and the Commission Can Enforce This Exclusion Order ....58

**TABLE OF CONTENTS CONT'D**

B. Potential Noninfringing Uses Are Not a Sufficient Reason to Disturb the Exclusion Order Given Suprema's *Mens Rea*..................61

C. Appellants Have Avenues of Recourse for Any Supposed Noninfringing Uses ......................................................................63

CONCLUSION ..........................................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alloc, Inc. v. Int'l Trade Comm'n*,
342 F.3d 1361 (Fed. Cir. 2003) ....................................................................33

*Bally/Midway Mfg. v.U.S. Int'l Trade Comm'n*,
714 F.2d 1117 (Fed. Cir. 1983) ....................................................................34

*Broadcom Corp. v. Int'l Trade Comm'n*,
542 F.3d 894 (Fed. Cir. 2008) ......................................................................33

*Broadcom Corp. v. Qualcomm Inc.*,
543 F.3d 683 (Fed. Cir. 2008) ......................................................................48

*Cheek v. United States*,
498 U.S. 192 (1991)......................................................................................51

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984)................................................................................18, 31

*Corning Glass Works v. U.S. Int'l Trade Comm'n*,
799 F.2d 1559 (Fed. Cir. 1986) ...........................................................4, 18, 33

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*,
246 F.3d 1336 (Fed. Cir. 2001) ....................................................................24

*Dawson Chem. Co. v. Rohm & Hass Co.*,
448 U.S. 176 (1980)......................................................................................21

*DSU Med. Corp. v. JMS Co.*,
471 F.3d 1293 (Fed. Cir. 2006) ..............................................................26, 42

*Enercon GmbH v. Int'l Trade Comm'n*,
151 F.3d 1376 (Fed. Cir. 1998) ....................................................................32

*ERBE Elektromedizin GmbH v. Int'l Trade Comm'n*,
566 F.3d 1028 (Fed. Cir. 2009) ....................................................................33

## TABLE OF AUTHORITIES CONT'D

*Federal Tr. Comm'n v. Nat'l Lead Co.*,
352 U.S. 419 (1957)........62

*FPC v. Idaho Power Co.*,
344 U.S. 17 (1952)........64

*Frischer & Co. v. Bakelite Corp.*,
39 F.2d 247 (C.C.P.A. 1930)........13, 28, 29, 30, 31, 32, 33

*Fromberg, Inc. v. Thornhill*,
315 F.2d 407 (5th Cir.1963)........22

*FTC v. Ruberoid Co.*,
343 U.S. 470 (1952)........17, 58, 61, 62

*Global-Tech Appliances, Inc. v. SEB S.A.*,
131 S. Ct. 2060 (2011)........10, 14-15, 18, 25-26, 30, 42-44, 48-51

*Henry v. A.B. Dick Co.*,
224 U.S. 1 (1912)........30

*Insituform Technologies, Inc. v. CAT Contracting, Inc.*,
385 F.3d 1360 (Fed. Cir. 2004)........25

*Jacob Siegel Co. v. Federal Trade Comm.*,
327 U.S. 608 (1946)........58

*KPMG, LLP v. S.E.C.*,
289 F.3d 109 (D.C. Cir. 2002)........62, 63, 64

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*,
545 F.3d 1340 (Fed. Cir. 2008)........33, 60

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012)........38

*Limelight Networks, Inc. v. Akamai Technologies, Inc.*,
134 S. Ct. 2111 (2014)........26

*Linear Tech. Corp. v. Int'l Trade Comm'n*,
566 F.3d 1049 (Fed. Cir. 2009)........19

**TABLE OF AUTHORITIES CONT'D**

*Mentor H/S, Inc. v. Medical Device Alliance, Inc.*,
244 F.3d 1365 (Fed. Cir. 2001) ....................24

*Merial Ltd. v. Cipla Ltd.*,
681 F.3d 1283 (Fed. Cir. 2012) ....................14, 27

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005).................... 12, 23, 24, 25, 27, 28

*Minnesota Min. & Mfg. Co. v. Chemque, Inc.*,
303 F.3d 1294 (Fed. Cir. 2002) ....................24, 38

*Norwegian Nitrogen Products Co. v. U.S.*,
288 U.S. 294 (1933)....................31, 32, 33

*NTP, Inc. v. Research In Motion, Ltd.*,
418 F.3d 1282 (Fed. Cir. 2005) ....................36

*In re Orion Co.*,
71 F.2d 458 (C.C.P.A. 1934)....................31, 33

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ....................52, 53, 54

*In re Seagate Tech., LLC*,
497 F.3d 1360 (Fed. Cir. 2007) (en banc) ....................47, 48

*Sealed Air Corp. v. U. S. Int'l Trade Comm'n*,
645 F.2d 976 (C.C.P.A. 1981)....................58, 59, 62, 63

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947)....................65

*Spansion, Inc. v. Int'l Trade Comm'n*,
629 F.3d 1331 (Fed. Cir. 2010) ....................19, 23

*Spindelfabrik Suessen-Schurr v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*,
903 F.2d 1568 (Fed. Cir. 1990) ....................62, 63

**TABLE OF AUTHORITIES CONT'D**

*Standard Oil Co. v. Nippon Shokubai Kagaku Kogyo Co.*,
754 F.2d 345 (Fed. Cir. 1985) ............................................................12, 24, 26

*SynQor, Inc. v. Artesyn Technologies, Inc.*,
709 F.3d 1365 (Fed. Cir. 2013) ..........................................................................26

*Tegal Corp. v. Tokyo Electron Co., Ltd.*,
248 F.3d 1376 (Fed. Cir. 2001) ..........................................................................25

*Tessera, Inc. v. Int'l Trade Comm'n*,
646 F.3d 1357 (Fed. Cir. 2011) ..........................................................................52

*United States v. Draves*,
103 F.3d 1328 (7th Cir. 1997) ............................................................................44

*United States v. Flores*,
454 F.3d 149 (3rd Cir. 2006) ..............................................................................18

*United States v. Florez*,
368 F.3d 1042 (8th Cir. 2004) ............................................................................50

*United States v. Freeman*,
434 F.3d 369 (5th Cir. 2005) ..............................................................................50

*United States v. Stadtmauer*,
620 F.3d 238 (3rd Cir. 2010) ........................................................................49, 51

*United States v. Stone*,
987 F.2d 469 (7th Cir. 1993) ..............................................................................45

*Viscofan, S.A. v. U.S. Int'l. Trade Comm'n*,
787 F.2d 544 (Fed. Cir. 1986) ............................................................................19

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) ............................................................................52

*Vizio, Inc. v. Int'l Trade Comm'n*,
605 F.3d 1330 (Fed. Cir. 2010) ..........................................................................33

*Warner Bros., Inc. v. U.S. Int'l Trade Comm'n*,
787 F.2d 562 (Fed. Cir. 1986) ............................................................................43

**TABLE OF AUTHORITIES CONT'D**

*Water Technologies Corp. v. Calco, Ltd.*,
850 F.2d 660 (Fed. Cir. 1988) ....................................................................25

*Young Engineers, Inc. v. U.S. Int'l Trade Comm'n*,
721 F.2d 1305 (Fed. Cir. 1983) ..................................................................32

**Administrative Decisions**

*Certain Baseband Processor Chips*,
Inv. No. 337-TA-543, USITC Pub. No. 4258, 2011 WL 6121182
(Oct. 1, 2011) ...............................................................................................60

*Certain Chemiluminescent Compositions, and Components Thereof and Methods of Using, and Products Incorporating the Same*,
Inv. No. 337-TA-285, USITC Pub. 2370, 0091 WL 11732560,
(March 1991) ..........................................................................................37, 38

*Certain Electronic Devices with Image Processing Systems, Components Thereof, and Associated Software*,
Inv. No. 337-TA-724, USITC Pub. No. 4374, Comm'n Op., 2012
WL 3246515 (Dec. 21, 2011) ............................................ 14, 35, 36, 37, 38, 64

*Certain Electronic Devices with Image Processing Systems, Components Thereof, and Associated Software*,
Inv. No. 337-TA-724, USITC Pub. No. 4374, Final Initial
Determination, 2011 WL 3385131 (July 1, 2011)...........................................36

*Certain Ground Fault Circuit Interrupters and Products Containing Same*,
Inv. No. 337-TA-615, USITC Pub. No. 4146, Order, 2009 WL
962585 (March 9, 2009) ...............................................................................60

*Certain Mems Devices and Products Containing Same*,
Inv. No. 337-TA-700, USITC Pub. No. 4294, 2011 WL 7592771
(May 10, 2011)...............................................................................................60

*Certain Multicellular Plastic Film*,
Inv. No. 337-TA-54, USITC Pub. No. 987, 1979 WL 442576 (June
12, 1979) .......................................................................................................59

## TABLE OF AUTHORITIES CONT'D

**Docketed Cases**

*Cross Match Technologies, Inc. v. Int'l Trade Comm'n*,
Appeal No. 2012-1026........................................................................1

*Cross Match Technologies, Inc. v. Int'l Trade Comm'n*,
Appeal No. 2012-1124........................................................................1

*Cross Match Technologies, Inc. v. Suprema, Inc.*,
No. 6:10-cv-28 (E.D. Tex.)...............................................................1, 2

*Motorola Mobility LLC v. International Trade Commission*,
Appeal No. 2013-1518........................................................................2

**Statutes**

5 U.S.C. § 706(2)(F) ..........................................................................18

19 U.S.C. § 1337 ..........................................................................*passim*

19 U.S.C. § 1337(d) ..........................................................................34

19 U.S.C. § 1337(f)...........................................................................34

19 U.S.C. § 1337(j) ........................................................................11, 34

35 U.S.C. § 271(a) ........................................ 10, 12, 13, 21, 38, 39, 57

35 U.S.C. § 271(b) ........................................2-3, 10-13, 19-32, 38, 58-59

35 U.S.C. § 271(c) ......................................................21, 22, 27, 28

35 U.S.C. § 298..................................................................................48

**Code of Federal Regulations**

19 C.F.R. § 210.76 ........................................................................17, 63

19 C.F.R. § 210.79 ........................................................................17, 63

**Federal Register Notes**

70 Fed. Reg. 43251 (July 26, 2005).......................................................11

**TABLE OF AUTHORITIES CONT'D**

75 Fed. Reg. 34482-83 (June 17, 2010).....4

**Legislative Materials**

1952 U.S.C.A.N.N. 2394.....22, 23

H.R. Rep. No. 82-1923 (1952).....20, 22

H.R. Rep. No. 100-40 (1987).....4

H.R. Rep. No. 100-576 (1988).....13, 32

Patent Law Treaties Implementation Act of 2012, Pub. L. No. 112-211, § 1(a) (enacted Dec. 18, 2012).....48

S. Rep. No. 67-595 (1922).....13, 29

S. Rep. No. 82-1979 (1952).....22

S. Rep. No. 100-71 (1987).....32

42 Stat. 858 (1922).....29

Tariff Act of 1922 § 316.....13, 29, 30

**Articles**

Giles S. Rich, *Congressional Intent—Or, Who Wrote the Patent Act of 1952?*, Patent Procurement and Exploitation, 60 (BNA 1963).....20

Giles S. Rich, *Infringement Under Section 271 of the Patent Act of 1952*, 35 J. Pat. Off. Soc'y 476 (1953)..... 12, 21, 22, 28, 31, 38

Harris, *Some Aspects of the Underlying Legislative Intent of the Patent Act of 1952*, 23 Geo. Wash. L. Rev. 658 (1954-55).....23, 28

"Symposium on Patents," *Summary of Proceedings, Section of Patents, Trademark and Copyright Law* (Chicago: American Bar Center, 1962) 143.....21

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| ’344 patent | U.S. Patent No. 7,203,344 (infringed patent) |
| ’993 patent | U.S. Patent No. 5,900,993 (infringed patent) |
| ’562 patent | U.S. Patent No. 7,277,562 (asserted patent that discloses the application that resulted in the ’344 patent) |
| ALJ | Administrative Law Judge |
| Blue En Banc Br. | [Corrected] Appellants’ Opening En Banc Brief, Docket Entry 123 |
| Blue Panel Br. | [Corrected] Principal Brief Of Appellants Suprema, Inc. and Mentalix, Inc., Docket Entry 37 |
| Commission | U.S. International Trade Commission |
| Cross Match | Cross Match Technologies, Inc. |
| Customs | U.S. Customs and Border Protection |
| Mentalix | Mentalix, Inc. |
| SDK | Software Development Kit |
| Suprema | Suprema, Inc. |

## STATEMENT OF RELATED CASES

The underlying investigation of the U.S. International Trade Commission ("the Commission") gave rise to three related appeals: this appeal (Appeal No. 2012-1170); *Cross Match Technologies, Inc. v. International Trade Commission*, Appeal No. 2012-1026; and *Cross Match Technologies, Inc. v. International Trade Commission*, Appeal No. 2012-1124. On December 13, 2013, a panel of this Court issued a judgment and opinion disposing of all three appeals. On February 3, 2014, the Court issued mandates in the two *Cross Match* appeals (Appeal Nos. 2012-1026 and 2012-1124). The mandates ended litigation concerning asserted U.S. Patent No. 7,277,562 ("the '562 patent") because the Court affirmed the Commission's determination that Cross Match Technologies, Inc., ("Cross Match") did not prove a violation of 19 U.S.C. § 1337 based on infringement of the '562 patent.

On February 21, 2014, the Commission and Cross Match each filed a combined petition for panel rehearing and rehearing en banc of this appeal. On May 13, 2014, the Court vacated the panel judgment and opinion with respect to this appeal and granted en banc rehearing of this appeal.

The Commission is also aware of one case pending before the United States District Court for the Eastern District of Texas, *Cross Match Technologies, Inc. v. Suprema, Inc.*, No. 6:10-cv-28 (E.D. Tex.) In that matter, Cross Match asserts

against Suprema, Inc. ("Suprema") and Mentalix, Inc. ("Mentalix") the same two patents at issue in this appeal, U.S. Patent No. 7,203,344 and U.S. Patent No. 5,900,993. The Texas action is stayed pending the final outcome of Investigation No. 337-TA-720. *Id.*, Dkt. No. 39 (June 21, 2010).

The Commission is also aware that this Court has stayed *Motorola Mobility LLC v. International Trade Commission*, Appeal No. 2013-1518, pending the outcome of this en banc rehearing. *See* Appeal No. 2013-1518, Order Staying Appeal, Docket Entry 79 (Fed. Cir. May 19, 2014). In that case, the Commission found no infringement under 35 U.S.C. § 271(b). The outcome of this en banc rehearing may have an impact on the *Motorola Mobility* appeal. Microsoft Corporation is an intervenor in the *Motorola Mobility* appeal and has filed an amicus curiae brief in this appeal.

**STATEMENT OF JURISDICTION**

Pursuant to Federal Circuit Rule 28(b), the Commission has no disagreement with Appellants' jurisdictional statement.

## STATEMENT OF ISSUES

The Commission disagrees with Appellants' statement of the issues. Pursuant to Federal Circuit Rule 28(b), the Commission submits that the issues on appeal are more properly framed as follows:

1. Whether inducement of infringement under 35 U.S.C. § 271(b) is patent infringement.

2. Whether the Commission correctly interpreted "articles that—infringe" under 19 U.S.C. § 1337(a)(1)(B)(i) to encompass articles that infringe under 35 U.S.C. § 271(b).

3. Whether the Commission's determination of induced infringement of U.S. Patent No. 7,203,344 ("the '344 patent") is in accordance with law and supported by substantial evidence.

4. Whether the Commission's determination of direct infringement of U.S. Patent No. 5,900,993 ("the '993 patent") is in accordance with law and supported by substantial evidence.

## STATEMENT OF THE CASE

Pursuant to Rule 28(a)(6), the Commission provides a statement of the case setting out the facts relevant to the issues of this appeal.

### A. The Trade Investigation at Issue

Congress has charged the Commission with the responsibility "to adjudicate trade disputes between U.S. industries and those who seek to import goods from abroad." H.R. Rep. No. 100-40, 157 (1987). Section 337 of the Tariff Act of 1930, as amended ("section 337"), deems unlawful "[t]he importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of articles that infringe a valid and enforceable United States patent." 19 U.S.C. § 1337(a)(1)(B)(i). The Commission draws upon its expertise in matters of unfair trade when making such determinations. *See Corning Glass Works v. U.S. Int'l Trade Comm'n*, 799 F.2d 1559, 1565 (Fed. Cir. 1986).

This appeal is from the Commission's final determination finding a violation of section 337 in *Certain Biometric Scanning Devices, Components Thereof, Associated Software, and Products Containing the Same*, Inv. No. 337-TA-720.

The Commission instituted the investigation on June 17, 2010, based on a complaint filed by Cross Match Technologies, Inc. ("Cross Match"). 75 Fed. Reg. 34482-83 (June 17, 2010). The complaint alleged that certain fingerprint scanning

devices imported and sold by Suprema and Mentalix infringed four Cross Match patents. A100010. This appeal concerns infringement of only two of those patents, the ’344 patent and the ’993 patent.[1]

### B. U.S. Patent No. 7,203,344

Cross Match’s ’344 patent pertains to a method for capturing and processing a fingerprint image. The patent describes a finger print scanner having a platen. A000288 at 2:24-27. A user places fingers against the platen. A000290 at 5:1-13. The scanner captures light reflected from the fingers and converts it to an electronic fingerprint image. A000291 at 8:4-19.

The invention processes the scanned fingerprint image using computer software. A000291 at 7:21-42. In a process called fingerprint segmentation, the software separates an image containing prints from multiple fingers into prints of individual fingers. A000291 at 7:58-61. To accomplish segmentation, the invention filters the fingerprint image to remove the ridges and valleys of the prints. A000295 at 15:28-31. The software then “binarizes” the filtered image by converting various shades in the image to either black or white. *Id*. at 15:32-42. Next the invention detects areas of the image having fingerprints. *Id*. at 15:43.

[1] The Commission’s noninfringement finding with respect to a third asserted patent, U.S. Patent No. 7,277,562, was affirmed by this Court in Appeal Nos. 2012-1026 and 2012-1124. Cross Match withdrew a fourth asserted patent—U.S. Patent No. 6,483,932—from the investigation. *See* A000036-37.

"[T]he detection step detects the areas concentrated by black pixels." *Id*. at 15:45-46. Then the invention detects fingerprint shapes. *Id*. at 15:46-47. The patent teaches that "fingerprint shapes can be oval-like shapes," so the shapes detected in this step are "black pixels that are comprised of oval-like shapes." *Id*. at 15:47-49. Finally, the invention determines whether the detected fingerprint areas and shapes are of an acceptable quality. A000294 at 14:23-58.

Claim 19 is the only claim of the '344 patent at issue in this appeal. Claim 19 delineates the method steps described above:

> 19. A method for capturing and processing a fingerprint image, the method comprising:
>
> (a) scanning one or more fingers;
>
> (b) capturing data representing a corresponding fingerprint image;
>
> (c) filtering the fingerprint image;
>
> (d) binarizing the filtered fingerprint image;
>
> (e) detecting a fingerprint area based on a concentration of black pixels in the binarized fingerprint image;
>
> (f) detecting a fingerprint shape based on an arrangement of the concentrated black pixels in an oval-like shape in the binarized fingerprint image; and
>
> (g) determining whether the detected fingerprint area and shape are of an acceptable quality.

A000297 at 19:31-37.

Appellants dispute the Commission's infringement determination concerning the steps of "detecting a fingerprint area" and "detecting a fingerprint shape" in claim 19.

**C. U.S. Patent No. 5,900,993**

Like the '344 patent, Cross Match's '993 patent pertains to fingerprint scanning. While the '344 patent focuses on the electronic processing of a fingerprint image, the '993 patent describes the optics inside a scanner that form a fingerprint image. Appellants' arguments with respect to the '993 patent are limited to their brief before the original panel in this appeal. The Commission likewise relies on its original panel brief to address the '993 patent issues.

**D. Suprema and Mentalix**

Appellant Suprema manufactures hardware in Korea for scanning fingerprints. A103229. In 2008, Suprema used the scanners of its American competitor Cross Match "as a reference" to design a new series of products. A400600; *see also* A400544.[2] Although Cross Match refused to sell its scanners to Suprema, Suprema used other means to acquire Cross Match scanners and Cross

[2] Appendix citations herein beyond A400500 contain additional materials from the Commission record that were not included in the originally filed joint appendix. The Commission separately will seek leave to file a supplemental appendix.

Match executable code. A400544-46. Suprema then conducted tests to understand the functions of the Cross Match scanners it acquired. A400593-94; A400600.

The fingerprint scanners that Suprema built contain a platen upon which a user places fingers. A103229. Inside the scanner, a series of optical elements focus light to form an image of the fingerprint. *Id.* A digital camera captures the fingerprint image. *Id.*

Appellant Mentalix is a Texas company that provides software for use with fingerprint scanners. A103233. The software processes fingerprint images captured by the scanner. *Id*. A103229. In June 2009, Suprema began inducing Mentalix to integrate Suprema scanners with Mentalix software. A303162-74. Suprema stated that it would "[[ ]]" Mentalix in its development of fingerprint segmentation software for use with its scanners. A303169. Suprema then shipped scanners to Mentalix in the United States for use in the collaboration. A303163. Mentalix used the imported scanners with a software program called "FedSubmit" to perform a method of fingerprint segmentation. A401379-80; A200312-13; A400638-39. Mentalix then [[ ]]. A400759-62.

### E. The ALJ's Initial Determination

Relevant to this appeal, the ALJ construed disputed terms in the '344 patent. A000078-94. The ALJ then compared the steps of claim 19 to the functions of

Suprema's scanners when those scanners run a software program developed by Mentalix called FedSubmit. A000123-33. The ALJ found that Suprema's RealScan-10, RealScan-D, RealScan-10F, and RealScan-DF scanners performed every step of claim 19 when running the FedSubmit software. A000133 n.l5; A000136.

The ALJ also construed disputed terms in the '993 patent claims and compared the asserted claims to the accused Suprema scanners. A000056-78; A000102-114. The ALJ found that Suprema's RealScan-10 and RealScan-10F products infringed apparatus claims 10, 12, and 15 of the '993 patent. A000204.

The ALJ recommended the Commission enter a limited exclusion order prohibiting Suprema and Mentalix from importing infringing articles, regardless of brand name. A000197. The ALJ further recommended that the exclusion order not be limited to specifically identified model numbers, consistent with long-standing Commission practice. A000197-98. Finally, the ALJ recommended a cease-and-desist order be entered against Mentalix to prevent distribution of a proven domestic inventory of infringing goods. A000199.

**F. The Commission's Final Determination**

On August 18, 2011, the Commission determined to review the ALJ's determination in part. A000023-26. The Commission determined to review some of the ALJ's infringement determinations with respect to the '344 patent but

determined not to review the ALJ's determination of direct infringement of the '993 patent. A000024.

On October 24, 2011, the Commission issued its final determination. A000209-242. In its opinion, the Commission modified and supplemented certain infringement findings with respect to the '344 patent. A000212, A000220-33. The Commission clarified that Mentalix performed the steps of claim 19 using a Suprema scanner and its FedSubmit software. A000220. The Commission therefore concluded that Mentalix directly infringed claim 19 under 35 U.S.C. § 271(a). *Id*.

The Commission found that Suprema induced Mentalix to use Suprema scanners to perform the patented steps of claim 19. A000220-27. The Commission found that Suprema studied Cross Match's products and knew that Cross Match held fingerprint scanning patents. A000221-25. The Commission further found that Suprema deliberately avoided confirming its suspicions that its scanners could be operated in a way that infringed Cross Match's patents. Relying on the doctrine of willful blindness articulated in *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060 (2011), the Commission determined that Suprema indirectly infringed claim 19 under 35 U.S.C. § 271(b). A000224-25. Based on the foregoing infringement findings, the Commission found that Appellants had

violated section 337 of the Tariff Act by importing "articles that—infringe" claim 19 under § 271(b) of the Patent Act. A000233.

The Commission agreed with the ALJ that the appropriate remedy was a limited exclusion order against Suprema and Mentalix and a cease and desist order against Mentalix. A000235-37. The Commission did not limit the exclusion order to specifically identified model numbers. Instead, the order tracks the language of section 337 by barring entry of biometric scanning devices "that infringe" the '344 and '993 patents. A400502. The limited exclusion order also contains a provision under which an importer may certify to U.S. Customs and Border Protection ("Customs") that the articles presented for importation do not infringe. A400502-03.

The Commission submitted its determination and remedial orders to the U.S. Trade Representative. *See* 19 U.S.C. § 1337(j); 70 Fed. Reg. 43251 (July 26, 2005). The U.S. Trade Representative did not disapprove the Commission's remedy, and the Commission's remedial orders became final.

## SUMMARY OF THE ARGUMENT

This case has significant implications for patent holders that rely on inducement liability for protection of their inventions, especially those that hold claims to inventive methods and those that operate industries in the United States.

With respect to the ’344 patent, the Commission correctly determined that Suprema imported scanners to induce direct infringement of method claim 19 by Mentalix. Inducing infringement under 35 U.S.C. § 271(b) constitutes patent infringement. Sections 271(a) and (b) of the Patent Act are expressly labeled “Infringement” by Congress. *See* 35 U.S.C. § 271. Judge Giles S. Rich,[3] a primary drafter of the infringement provisions in the Patent Act of 1952, emphasized that Congress intended identical infringement liability under both provisions. Giles S. Rich, *Infringement Under Section 271 of the Patent Act of 1952*, 35 J. Pat. Off. Soc’y 476, 491-92 (1953) [hereinafter Rich, *Infringement*]. And, contrary to Appellants’ position, both the Supreme Court and this Court have tied inducement liability to supplying articles used to directly infringe. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 940 n.13 (2005); *Standard Oil Co. v. Nippon Shokubai Kagaku Kogyo Co.*, 754 F.2d 345, 348 (Fed. Cir. 1985). Based on substantial evidence of inducement of infringement, the

[3] For simplicity, this brief will refer to Giles S. Rich as “Judge Rich,” although he was not a judge at the time he drafted the Patent Act’s infringement provisions.

Commission properly found that Appellants violated section 337 of the Tariff Act by importing "articles that—infringe" claim 19 of the '344 patent. *See* 19 U.S.C. § 1337(a)(1)(B)(i).

Appellants contend that when Congress prohibited the importation of "articles that—infringe" a patent under section 337, Congress meant to *excuse* the importation of articles intended to induce patent infringement. There is absolutely no support in the language of the statute or the legislative history of section 337 for Appellants' construction. The importation of "articles that—infringe" via inducement under § 271(b) of the Patent Act is no less prohibited by section 337 than the importation of "articles that—infringe" directly under § 271(a).

The legislative history of the Tariff Act makes clear that it was intended to prevent "every type and form of unfair practice" in the importation of goods. S. Rep. No. 67-595, at 3 (1922). From the beginning, courts understood inducement of patent infringement to be an unfair practice within the scope of the Act. *See Frischer & Co. v. Bakelite Corp.*, 39 F.2d 247, 259-60 (C.C.P.A. 1930). Congress ratified that understanding when it amended the Act to expressly prohibit the importation of "articles that—infringe" and stated that it did "not intend to change the interpretation or implementation of current law." *See* H.R. Rep. No. 100-576, at 633 (1988). The only way the Court could adopt Appellants' interpretation of section 337 would be to ignore the Patent Act, the language of

section 337, the intent of Congress, and decades of established practice. This the Court should not do.

To prove the importation of "articles that—infringe" via inducement under section 337 requires proof of three essential elements: (1) importation of an article that is the means of infringement; (2) an intent that the imported article be used to infringe a patent, or willful blindness to infringement; and (3) an act of direct infringement involving the article. *Certain Electronic Devices with Image Processing Systems, Components Thereof, and Associated Software*, Inv. No. 337-TA-724, USITC Pub. No. 4374, Comm'n Op., 2012 WL 3246515, at *8-13 (Dec. 21, 2011) ("*Electronic Devices*"); *see Global-Tech*, 131 S. Ct. at 2065; *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1302-03 (Fed. Cir. 2012). The record on review contains substantial evidence of each element.

With respect to importation, Suprema solicited Mentalix to collaborate in the development of a fingerprint scanner on par with Cross Match scanners. A303162-74. After developing the scanners, Appellants intended to [[

]]." A303172. Suprema [[

]]. A303163. After Appellants

[[

]]. A400759-62.

With respect to intent, the Commission found that Suprema's willful blindness satisfied that element under the Supreme Court's decision in *Global-Tech*. A000224-25. The Commission found that Suprema took deliberate steps to avoid confirming the infringing nature of its activities throughout its collusion with Mentalix. A000220-27. Suprema searched for patents containing the words "Cross Match," but it only selectively reviewed patents containing those words. A400573-74; A200330. Appellants admit that a Suprema executive picked up Cross Match's '562 patent but intentionally stopped reviewing the patent after he read the abstract. Blue En Banc Br. at 18. The record shows the executive *knew* [[ ]]. A400578. If he had kept reading, he would have come across no less than five references to the application that led to the infringed '344 patent. A000305; A000316; A000318. By the time Cross Match filed its complaint with the Commission, infringement of Cross Match patents had become [[ ]]. A400598. [[

]]. A400751; A400585. Substantial evidence shows Suprema deliberately avoided any confirmation of its own suspicions of infringement.

With respect to direct infringement, Mentalix used imported Suprema scanners to directly infringe claim 19 by conducting tests and demonstrations that performed fingerprint segmentation. A200312-13; A303894-95. Mentalix instructed customers to use the imported Suprema scanners to perform the fingerprint segmentation method covered by claim 19, and customers performed the method. A303895.

The Commission also correctly construed claim 19 of the ’344 patent. “Detecting a fingerprint area” does not require a mathematical calculation of area (A000295 at 15:43-46), and “detecting a fingerprint shape” does not require a mathematical calculation of an oval (A000295:15:43-49). The Commission adopted Appellants’ “plain meaning” construction of the former term and Appellants never requested the Commission to separately construe the latter term. A000128-31. When comparing the properly construed claims to the accused devices, the Commission identified specific source code functions that met the disputed limitations. *Id*. The Commission’s infringement determination is therefore supported by substantial evidence.

Turning to the ’993 patent, there is no dispute that section 337 can reach importation of articles that *directly* infringe the asserted apparatus claims of that patent. The Commission urges the en banc court to reinstate the panel decision with respect to the ’993 patent.

Having correctly found that Appellants violated section 337 by importing articles that infringe the ’344 and ’993 patents, the Commission issued the statutorily defined remedies of an exclusion order and a cease and desist order. A400501. Under well-established principles of administrative law, the Commission’s remedy should be affirmed because it bears a reasonable relation to Appellants’ violation. *See FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952). With respect to the infringed apparatus claims of the ’993 patent, Appellants raise no argument about the Commission’s order. With respect to the infringed method claim of the ’344 patent, it is difficult to see how any future importation of Suprema scanners could be free from the taint of Appellants’ proven *mens rea*. Nevertheless, if Appellants have legitimate noninfringing purposes for importing the accused scanners, Appellants have several options. The exclusion order allows Appellants to certify to Customs that their articles do not infringe. A400502-03. Appellants may also seek an advisory opinion from the Commission about a proposed course of conduct, 19 C.F.R. § 210.79, or seek modification of the order if justified by changed circumstances, *id*. at § 210.76.

## ARGUMENT

### I. Standard of Review

Appellants' statement of the standard of review is incomplete. The Commission provides a complete statement of the relevant standards below.

Appellants challenge the Commission's interpretation of section 337, the statute the Commission is charged to administer. This Court will uphold the Commission's interpretation of section 337 if it is reasonable in light of the language, policies, and legislative history of the statute. *Corning*, 799 F.2d at 1565; *see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837, 842-45 (1984).

Appellants challenge the Commission's determination that Suprema willfully blinded itself to infringement of the '344 patent. Because Appellants do not dispute that the statement of the law in *Global-Tech* is correct (Blue En Banc Br. at 54), the Court need only determine if substantial evidence supports a willful blindness finding. *See United States v. Flores*, 454 F.3d 149, 154-56 (3rd Cir. 2006). In reviewing the Commission's determination for substantial evidence, the Court must view the evidence in the light most favorable to the Commission. 5 U.S.C. § 706(2)(F); *see Global-Tech*, 131 S. Ct. at 2071 (reviewing evidence "in the light most favorable to the verdict" to determine if it is "sufficient"); *Flores*, 454 F.3d at 154-56.

Appellants challenge the Commission's interpretation of claim 19 of the '344 patent and claims 10, 12, and 15 of the '993 patent. Claim construction is a question of law that this Court reviews *de novo*. *Linear Tech. Corp. v. Int'l Trade Comm'n*, 566 F.3d 1049, 1054 (Fed. Cir. 2009).

Appellants challenge the Commission's factual determinations concerning the operation of the accused imported articles. Those determinations are questions of fact that this Court reviews for substantial evidence. *Id*. at 1060. Under the substantial evidence test, the Court "must affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion." *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1344 (Fed. Cir. 2010) (internal quotations omitted).

Appellants finally challenge the Commission's choice of remedy. "[T]he Commission has broad discretion in selecting the form, scope and extent of the remedy, and judicial review of its choice of remedy necessarily is limited." *Viscofan, S.A. v. U.S. Int'l. Trade Comm'n*, 787 F.2d 544, 548 (Fed. Cir. 1986).

## II. Violation Based on Articles that Infringe the '344 Patent

The Commission determined that Appellants violated section 337 by importing articles that infringe method claim 19 of the '344 patent via inducement under 35 U.S.C. § 271(b). A000220-27. As discussed below, the Commission's determination contains no legal error and is supported by substantial evidence.

### A. Section 337 Covers Importation of Articles that Infringe under 35 U.S.C. § 271(b)

Appellants concede, and the Commission agrees, that "the relevant authority and basis for the Commission's order" on review here is section 337(a)(1)(B)(i). Blue En Banc Br. at 26-27. That statute makes unlawful "the importation into the United States, the sale for importation, or the sale within the United States after importation . . . of articles that [ ] infringe a valid and enforceable United States patent." 19 U.S.C. § 1337(a)(1)(B)(i). Appellants argue that "[b]y definition," the accused articles at issue "are not infringing articles at the time of importation." Blue En Banc Br. at 36. As explained below, Appellants are wrong about the "definition" of infringement. A proper understanding of the law of infringement is fundamental to the correct interpretation of section 337(a)(1)(B)(i) and to the correct disposition of this case. The law of infringement is reviewed first below. The word "infringe" in section 337 is then explained in that context.

#### 1. Inducement under § 271(b) Is Infringement

Congress defined patent infringement for the first time in the Patent Act of 1952. H.R. Rep. No. 82-1923 at 9 (1952). Judge Rich was instrumental in drafting the infringement statute, and he later interpreted that statute for nearly half a century as a jurist on this Court and its predecessor. *See* Giles S. Rich, *Congressional Intent—Or, Who Wrote the Patent Act of 1952?*, Patent

Procurement and Exploitation, 60, 67-68 (BNA 1963). His writings on the subject are authoritative.[4]

Section 271(a) of the Patent Act defines direct infringement. As Judge Rich explained, a patent claim is not directly infringed unless it reads on the structure or process made, used, or sold by the defendant. Rich, *Infringement*, at 491. But because "overly smart people thought they saw a way to steal inventions and avoid infringement" by selling or using less than the claimed invention, Congress defined induced infringement under § 271(b) and contributory infringement under § 271(c). *Id*. at 481. Those sections now read as follows:

> (b) Whoever actively induces infringement of a patent shall be liable as an infringer.
>
> (c) Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

---

[4] Congressman Crumpacker stated that "[w]hen the courts, in seeking to interpret the language of the [Patent] Act, go through the ritual of seeking to ascertain 'the intent of Congress' in adopting same, they would do well to look into the writing of these men—[P.J.] Federico, [Giles S.] Rich, [L. James] Harris—as they, far more than any member of the House or Senate, knew and understood what was intended by the language used." "Symposium on Patents," *Summary of Proceedings, Section of Patents, Trademark and Copyright Law* (Chicago: American Bar Center, 1962) 143. The Supreme Court has also heavily relied on Judge Rich's testimony when interpreting § 271. *Dawson Chem. Co. v. Rohm & Hass Co*., 448 U.S. 176, 204-14 (1980).

35 U.S.C. §§ 271(b), (c) (2012).

Judge Rich and the legislative reports for the Patent Act all emphasized that infringement under § 271(b) *is itself patent infringement*, nothing less. *See* Rich, *Infringement* at 491-92 (one who induces infringement under § 271(b) "is an infringer"); H.R. Rep. No. 82-1923, at 9 ("one who aids and abets an infringement is likewise an infringer"); S. Rep. No. 82-1979 (1952), *reprinted in* 1952 U.S.C.A.N.N. 2394, 2402 (same).[5] The House and Senate reports further state that one who infringes under § 271(b) "is obviously appropriating the benefit of the patented invention." 1952 U.S.C.A.N.N. 2402. Appellants cannot ignore the enacted expression and clear intent of Congress that the word "infringe" encompasses infringement under § 271(b).

**2. Infringement under § 271(b) Is Often Tied to Articles**

Appellants also contend that infringement under § 271(b) is not tied to articles, and therefore inducement liability has no place in a trade statute regulating the importation of articles. *See, e.g.*, Blue En Banc Br. at 37. As discusses below, the law of inducement encompasses much more than Appellants acknowledge.

Any action that intentionally causes or encourages infringement by another may give rise to liability under § 271(b). *See, e.g., Fromberg, Inc. v. Thornhill*,

[5] Judge Rich and the legislative reports referred to infringement under § 271(b) and (c) as "two kinds of contributory infringement," following the nomenclature used by courts at the time. *See* Rich, *Infringement* at 491.

315 F.2d 407, 411 (5th Cir.1963) (the term "inducement" is "as broad as the range of actions by which one in fact causes, or urges, or encourages, or aids another to infringe a patent"). The House and Senate reports both state that § 271(b) enjoins those who seek "to cause *infringement by supplying someone else with the means* and directions for infringing a patent." 1952 U.S.C.A.N.N. 2402. L. James Harris, counsel to the House Judiciary Committee during the drafting of the 1952 Patent Act,[6] similarly explained that "furnishing apparatus with the intent that it be used to carry out a patented process" gives rise to liability under § 271(b). L. James Harris, *Some Aspects of the Underlying Legislative Intent of the Patent Act of 1952*, 23 Geo. Wash. L. Rev. 658,670, 694-96 (1954-55). Clearly, Congress contemplated that articles could play a determinative role in the inducement of direct infringement under § 271(b).

The Supreme Court's decision in *Grokster* reinforces this understanding.[7] The Court stated,

---

[6] Harris "knew and understood what was intended" by Congress. *See "Summary on Patents," supra* note 4, at 143.

[7] While *Grokster* ultimately concerned inducement of copyright infringement, it relied heavily on established law concerning the inducement of patent infringement. *See Grokster*, 545 U.S. at 936. This Court has applied the induced infringement analysis in *Grokster* to appeals of Commission determinations based on patent infringement under 35 U.S.C. § 271(b). *See, e.g., Spansion*, 629 F.3d at 1355.

> "[*T*]*he distribution of a product* can itself give rise to liability [for induced infringement] where evidence shows that the distributor intended and encouraged the product to be used to infringe. In such a case, *the culpable act* is not merely the encouragement of infringement but also *the distribution of the tool* intended for infringing use."

*Grokster*, 545 U.S. at 940 n.13 (emphasis added).

This Court has similarly affirmed that supplying articles to customers can give rise to liability under § 271(b) where a defendant intends that the customers use the articles to infringe. For example, writing for the Court in *Standard Oil Co. v. Nippon Shokubai Kagaku Kogyo Co.*, Judge Rich noted that when a foreign company "supplied" an imported catalyst for use in a patented method, liability for infringement under § 271(b) could attach to the importer. 754 F.2d at 348. Several other cases hold the same. *See, e.g.*, *Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1305 (Fed. Cir. 2002) (defendant induced infringement when it "supplied" "infringing products" even though direct infringement only occurred after later use of the kits sold); *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365, 1379 (Fed. Cir. 2001) (holding defendant liable for "induced infringement because it sold the device with the intention that doctors would use it to perform the patented method"); *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1351 (Fed. Cir. 2001) (foreign supplier's "acts in connection with selling its chip . . . constitute active inducement" of infringement). In all of these cases, courts found

the defendant liable for distributing "the tool intended for infringing use." *See Grokster*, 545 U.S. at 940 n.13.

The Commission does not suggest that merely supplying an article that *could* be used to infringe, without more, constitutes inducement of infringement under § 271(b). Nor does the Commission suggest that inducement *always* involves articles. Circumstances may vary widely, but the case law shows three essential elements for infringement liability under § 271(b): (1) an affirmative act performed with (2) an intent to cause direct infringement, resulting in (3) direct infringement. Each element is reviewed briefly below.

The first requirement for liability under § 271(b) is "an affirmative act of some kind." *Tegal Corp. v. Tokyo Electron Co., Ltd*., 248 F.3d 1376, 1379 (Fed. Cir. 2001); *see Global-Tech*, 131 S. Ct. at 2065 ("inducement must involve the taking of affirmative steps to bring about the desired result"). The affirmative act may or may not involve articles. As noted above, the affirmative act could be importing a catalyst, distributing a product, or selling a chip. But liability may also arise from merely providing instructions to others. *See, e.g*., *Insituform Technologies, Inc. v. CAT Contracting, Inc*., 385 F.3d 1360, 1378 (Fed. Cir. 2004) (holding defendants liable for infringement under § 271(b) because they "taught their licensees to use" a patented process); *Water Technologies Corp. v. Calco, Ltd*., 850 F.2d 660, 668 (Fed. Cir. 1988) (holding individual liable under § 271(b)

for providing resin formulas to manufacturer). Thus, while acts of inducement need not involve articles, actions involving articles may be fundamental to infringement under § 271(b).

The second requirement for liability under § 271(b) is an intent on the part of the accused to cause direct infringement. *See DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc in relevant part) ("the inducer must have an affirmative intent to cause direct infringement"). This prong implicitly requires knowledge of the existence of the patent that is infringed. *Global-Tech*, 131 S. Ct. at 2068; *SynQor, Inc. v. Artesyn Technologies, Inc.*, 709 F.3d 1365, 1379 (Fed. Cir. 2013). As discussed in section II.C. herein, a finding that a defendant willfully blinded itself to the existence of a patent can substitute for this second requirement. *Global-Tech*, 131 S. Ct. at 2068-71.

Finally, liability under § 271(b) requires an act of direct infringement. *Limelight Networks, Inc. v. Akamai Technologies, Inc.*, 134 S. Ct. 2111, 2117 (2014) ("where there has been no direct infringement, there can be no inducement of infringement under § 271(b)"). Although an act of direct infringement is necessary to consummate an inducement claim, this Court has made clear that liability for infringement by inducement attaches "*as of the time the acts were committed*, not at some future date" of direct infringement. *Standard Oil*, 754 F.2d at 348 (Rich, J.) (emphasis in original). The Supreme Court has similarly stated

that "the distribution of the tool intended for infringing use" is a "culpable act." *Grokster*, 545 U.S. at 940 n.13. Additionally, liability may attach for actions taken in foreign countries to induce direct infringement inside the United States. *Merial*, 681 F.3d at 1302-03.

### 3. Supplying a "Staple Article" Can Give Rise to Liability Under § 271(b)

Appellants repeatedly contend that a staple article with a noninfringing use necessarily avoids all liability for infringement because it falls within the safe harbor of § 271(c). *See, e.g.*, Blue En Banc Br. at 32. Appellants support this contention by selectively (and misleadingly) quoting *Grokster* for the proposition that "distribution of a component of a patented device will not violate the patent if it is suitable for use in other ways." *See id*. (parenthetical quoting *Grokster*, 545 U.S. at 932). But Appellants failed to inform this Court that *Grokster* includes a critical limitation to the rule they quoted: "the Patent Act's exemption from liability for those who distribute a staple article of commerce, 35 U.S.C. § 271(c)," does *not* extend "to those who induce patent infringement, § 271(b)." *Grokster*, 545 U.S. at 935 n.10.

Moreover, the drafters of the Patent Act never intended the safe harbor provision of § 271(c) to be enlarged to shield one who intentionally induces infringement from liability under § 271(b). Harris' commentary states,

> [I]f paragraph (b) were violated by actively inducing infringement, a person would be guilty of the something more than merely selling a staple article of commerce. It then would be an infringement *whether it concerned a staple article or not.*

Harris, 23 Geo. Wash. L. Rev. 658, 696 (citing Judge Rich's testimony before Congress). *See also* Rich, *Infringement*, at 493.

This case turns on the rule Appellants omitted from their brief. As the Supreme Court explained in the case cited by Appellants, the safe harbor in 35 U.S.C. § 271(c) does *not* extend to those who induce patent infringement under § 271(b). *Grokster*, 545 U.S. at 935 n.10. Thus, even if Suprema scanners are staple goods before they are combined with Mentalix software, that fact is not dispositive. Suprema's collusion with Mentalix to create and intentionally import an article that performs each step of claim 19 closes the safe harbor within § 271(c).

#### 4. Historically, Section 337 Included Liability for Articles Imported to Induce Infringement

The Commission and this Court's predecessor have construed section 337 as establishing liability for inducing patent infringement via imported articles. As explained below, Appellants' position ignores that history and the deference due to the Commission's long-standing interpretation.

Congress established the predecessor to today's International Trade Commission in 1916, naming it the Tariff Commission. *See Bakelite*, 39 F.2d at

254. Soon after its creation, the Commission was charged with administration of section 316 of the Tariff Act of 1922, the predecessor of modern section 337. Section 316 declared "unfair methods of competition and unfair acts in the importation of articles" to be "unlawful." 42 Stat. 858, 943 (1922). Section 316 contained no express reference to patent infringement, but Congress stated its intent that the statute prevent "every type and form of unfair practice" in the importation of goods. S. Rep. No. 67-595, at 3 (1922).

In the 1920s, the Tariff Commission was asked to determine whether the importation of articles alleged to infringe U.S. patents held by the Bakelite Corporation would fall within the "unfair methods of competition and unfair acts" made unlawful by section 316. *See Bakelite*, 39 F.2d at 250. Mindful of Congress's directive to broadly construe that part of the statute, the Commission held that the importation in question was prohibited. *Id*. at 251. In an appeal to this Court's predecessor, the *Bakelite* respondents raised the same argument that Appellants raise in this appeal: they argued that they "cannot be held responsible for what others may have done with the goods they imported and sold to them." *Id*. at 260. The court rejected that argument and affirmed the Commission, relying on the doctrine of induced infringement. The court explained, "where a defendant in an infringement suit knew of the existence of the patent and that another person was infringing the same, and sells to such other person supplies without which the

infringer could not operate the same, with the intent and purpose that such infringed article should be used by means of said supplies, such defendant assists in the infringing use and is contributory thereto." *Id*. at 260 (citing *Henry v. A.B. Dick Co*., 224 U.S. 1, 33-48 (1912)); *see Global-Tech*, 131 S. Ct. at 2066-67 (explaining that *Henry v. A.B. Dick* represents the modern doctrine of inducement of infringement under 35 U.S.C. § 271(b)).

The *Bakelite* court therefore found the imported articles to be "in violation of [the] complainant's patent rights." *Bakelite*, 39 F.2d at 260. The court further noted that domestic patentees had "no effective means through the courts of preventing the sale of imported merchandise in violation of their patent rights" because it would be impractical "to proceed against each individual dealer selling the infringing articles." *Id*. The court therefore determined that the Tariff Act "may be invoked to reach the foreign articles at the time and place of importation by forbidding entry into the United States of those articles which upon the facts in a particular case are found to violate rights of domestic manufacturers." *Id*. Thus, the *Bakelite* court sustained the Commission's determination that the inducement of infringement via imported articles was a violation of patent rights and a violation of the Tariff Act.

Congress re-enacted section 316 of the Tariff Act of 1922 as section 337 of Tariff Act in 1930. Almost immediately after its passage, the Commission and the

courts construed the Act to prohibit the importation of articles that infringe a U.S. patent, relying heavily on the *Bakelite* case. *In re Orion Co.*, 71 F.2d 458, 465-66 (C.C.P.A. 1934).

The *Bakelite* and *Orion* cases reflect the understanding of those "charged with the responsibility of setting [the] machinery [of the statute] in motion." *See Norwegian Nitrogen Products Co. v. U.S.*, 288 U.S. 294, 315 (1933). Those early constructions are entitled to "peculiar weight." *Id*. *See also Chevron*, 467 U.S. at 843.

Two decades after the *Bakelite* and *Orion* cases, Congress enacted § 271(b). Judge Rich explained that § 271(b) was enacted "to afford adequate protection to valid patents against those who are clearly seeking to benefit from piracy, *especially in situations where enforcement against direct infringers is impractical*." Rich, *Infringement*, at 497 (emphasis added). Thus, the Congressional motivations behind § 271(b) were identical to the reasoning applied in the *Bakelite* case. *See Bakelite*, 39 F.2d at 260 (applying inducement liability because it would be impractical "to proceed against each individual dealer selling the infringing articles"). Section 337 and § 271(b) were perfectly congruent.

Years passed and Congress created this Court in 1982. Within a year, this Court affirmed Commission orders that were issued upon proof of the importation

of articles that infringed patent rights under § 271(b). *See Young Engineers, Inc. v. U.S. Int'l Trade Comm'n*, 721 F.2d 1305, 1310, 1317 (Fed. Cir. 1983).

In 1988, Congress amended the Tariff Act of 1930 and added the language at issue in this case, which now expressly prohibits the "importation . . . of articles that—infringe" a U.S. patent. *See* H.R. Rep. No. 100-576, at 112 (1988). The legislative history explains that Congress did "not intend to change the interpretation or implementation of current law as it applies to the importation or sale of articles that infringe certain U.S. intellectual property rights." *Id.* at 633; *Enercon GmbH v. Int'l Trade Comm'n*, 151 F.3d 1376, 1382 (Fed. Cir. 1998). Thus, when Congress added the statutory language in question, it endorsed the Commission's interpretation of section 337, including induced infringement holdings affirmed in cases like *Bakelite* and *Young Engineers*. *See Norwegian Nitrogen*, 288 U.S. at 314-15 (affirming the Commission's construction of a related provision of the Tariff Act where it had "been continued and confirmed with the tacit approval of the President and the acquiescence of the Congress"). There is no evidence that when Congress added the "articles that—infringe" language in 1988 it meant to *reduce* liability for articles intentionally imported to induce direct infringement. To the contrary, the legislative history states that the 1988 amendments were meant to "strengthen" the enforcement of patent rights. S. Rep. No. 100-71, at 128 (1987).

After the 1988 amendments, this Court continued to affirm the Commission's determinations concerning articles imported to induce infringement. *See, e.g.*, *Vizio, Inc. v. Int'l Trade Comm'n*, 605 F.3d 1330, 1343-44 (Fed. Cir. 2010) (affirming exclusion order issued on proof of induced infringement).[8]

The foregoing history demonstrates that section 337 has, from the beginning, made unlawful the importation of articles that infringe a U.S. patent via inducement. In the case under review here, the Commission applied the Tariff Act as it was interpreted in the early *Bakelite* and *Orion* cases. The Commission's long-standing interpretation is entitled to deference. *Corning*, 799 F.2d at 1565 (the Commission is entitled to deference in construing its own statute because of its particular expertise); *see Norwegian Nitrogen*, 288 U.S. at 315.

### 5. Appellants Confuse Violation with Remedy

Appellants argue that the Commission's interpretation of section 337(a)(1)(B)(i) must be incorrect because Customs cannot determine whether an article is imported with the intent to induce infringement by examining it. Blue En

[8] For other examples of Commission cases involving induced infringement, see *ERBE Elektromedizin GmbH v. Int'l Trade Comm'n*, 566 F.3d 1028, 1030 (Fed. Cir. 2009); *Broadcom Corp. v. Int'l Trade Comm'n*, 542 F.3d 894, 898-900 (Fed. Cir. 2008); *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340 (Fed. Cir. 2008); and *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361 (Fed. Cir. 2003). The fact that none of these cases questioned the Commission's authority to adjudicate inducement supports a conclusion that the Commission's interpretation of section 337 was reasonable and well-established.

Banc Br. at 52. As explained below, Appellants' argument errs by confusing the distinct legal concepts of *violation* and *remedy* in section 337.

In a Commission investigation based on patent infringement, the Commission first determines whether there has been a *violation* of the statute through acts prohibited in section 337(a). A determination of violation involves determining that (1) articles have been imported or sold; (2) the articles infringe; and (3) a domestic industry exists. 19 U.S.C. § 1337(a). Only "if" a violation has been established may the Commission consider a remedy. 19 U.S.C. § 1337(d). A determination of *remedy* involves determining (1) whether an exclusion order, cease and desist order, or both would be appropriate; (2) whether a remedy should not issue given the effect the remedy would have on the public interest; and (3) the appropriate bond required for importation during the Presidential review period. 19 U.S.C. § 1337(d), (f), (j). As this Court has correctly noted, the Commission may not consider questions of *remedy* before the agency determines whether there is a *violation*. *See Bally/Midway Mfg. v.U.S. Int'l Trade Comm'n*, 714 F.2d 1117, 1122-23 (Fed. Cir. 1983).

Appellants argue that if Customs cannot determine whether an article is imported with the intent to induce infringement when enforcing the Commission's remedy, then the act of importing such an article cannot be a violation of section 337, and because there is no violation there can be no remedy. Not only is

Appellant's argument circular, it also applies the conditional "if" clause in the remedy section of the statute in reverse. Appellants would force a rule that the Commission can only find an act to be a violation under section 337(a) "if" it could be stopped by Customs. That is contrary to the plain words of the statute. For example, Customs does not stop a "sale after importation" of an infringing article already in the United States, and yet such a sale is a violation defined in paragraph (a). *See* 19 U.S.C. § 1337(a)(1)(B). In addition, Customs has no authority to determine a violation of section 337; the statute reserves that authority to the Commission. *See id*. at § 1337(a) ("when *found by the Commission* to exist" (emphasis added)). Rather, Customs enforces exclusion orders if the Commission finds a violation of section 337 and issues such orders.

Appellants' criticisms of the Commission's remedial order or the practicality of enforcing that order have no relevance to the definition of a violation of the Tariff Act. Appellants' arguments are also contradicted by the experience of prior cases. These issues are addressed more fully in the remedy section at the end of this brief.

#### 6. Appellants Misrepresent the Commission's Decision in *Electronic Devices*

The Commission recently reaffirmed its interpretation of section 337(a)(1)(B)(i) as reaching induced infringement in *Electronic Devices*. 2012 WL 3246515, at *8-9 ("section 337(a)(1)(B)(i) covers imported articles that directly or

indirectly infringe when it refers to 'articles that – infringe.'"). However, Appellants have misrepresented the Commission's opinion in that investigation in their en banc brief to this Court. *Electronic Devices* concerned, *inter alia*, an allegation that certain general purpose computers were being used to infringe a patent claim to a method of decoding a particular kind of graphical data. The graphical data at issue was not inherent to the computers; it was used in certain types of video games, for example. The Commission noted this Court's law concerning infringement of method claims and held that merely importing a device that may be used to perform a patented method does not constitute direct infringement of a claim to that method. 2012 WL 3246515, at *12 (citing *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1319 (Fed. Cir. 2005)). The Commission thus required proof of indirect infringement via the imported devices. The Commission found the complainant had failed to prove indirect infringement, so there were no imported "articles that—infringe," either directly or indirectly. *Id.* at *12-13.[9]

[9] More specifically, the Commission adopted the ALJ's determination on indirect infringement, which was that the complainant did not "clearly enunciate how" the respondent induced infringement of the claimed method. *See Certain Electronic Devices with Image Processing Systems, Components Thereof, and Associated Software*, Inv. No. 337-TA-724, USITC Pub. No. 4374, Final Initial Determination, 2011 WL 3385131, at *66 (July 1, 2011).

With regard to a patented method, Appellants apparently would lead this Court to believe that the Commission in *Electronic Devices* set forth a categorical rule that "domestic use of such a method . . . is not a sufficient basis for a violation of Section 337(a)(1)(B)(i)." Blue En Banc Br. at 35 (quoting *Electronic Devices*). But Appellants leave out two critical words in their quotation; the Commission actually said that "domestic use of such a method, *without more*, is not a sufficient basis for a violation of Section 337(a)(1)(B)(i)." *See Electronic Devices*, 2012 WL 3246515, at *13 (emphasis added).

The "more" that the Commission requires for method claims is no mystery: the Commission explained that the complainant in *Electronic Devices* "might have proved a violation of section 337 if it had proved indirect infringement" of the method claim at issue. *Id*. The *Electronic Devices* opinion also cited a leading 1991 decision by ALJ Luckern concerning a method claim asserted in a section 337 proceeding against imported glow-in-the-dark necklaces. *See id*. at 12 (citing *Certain Chemiluminescent Compositions, and Components Thereof and Methods of Using, and Products Incorporating the Same*, Inv. No. 337-TA-285, USITC Pub. 2370, 0091 WL 11732560, at *27 n.45 (March 1991)). Judge Luckern succinctly stated that the method claim at issue "is not directly infringed by the importation" of the accused articles; instead, direct infringement "results from the method of use" of the articles. *Chemiluminescent Compositions*, 0091 WL

11732560, at *27 n.45. Consequently, Judge Luckern determined, "importation and sale of the necklaces constitute contributory and induced infringement of claim 8," *id*., and the Commission adopted that determination, *id*. at *3.

The Commission's determination in *Electronic Devices* supports the Commission's position in this appeal, not Appellants'.

### B. The Record Shows Infringement at the Time of Importation

Another major premise of Appellants' argument is that "the articles at issue are not infringing articles at the time of importation" because any direct infringement using those articles occurs after importation. *See, e.g*., Blue En Banc Br. at 36. That argument is legally erroneous and contradicts substantial evidence in the record in several ways.

First, Appellants assume that the word "infringing" in their formulation can only mean direct infringement under § 271(a). As explained above, that plainly is not the law. Articles that infringe via inducement under § 271(b) are no less infringing than articles that directly infringe under § 271(a). *See* Rich, *Infringement,* at 491-92. The articles at issue here were imported with the specific intention to induce patent infringement. A000220-27. They are infringing articles. *See, e.g*., *Chemque*, 303 F.3d at 1305 (characterizing kits used by customers as "infringing products" even though sale of the kits was inducement, not direct infringement); *LaserDynamics, Inc. v. Quanta Computer, Inc*., 694 F.3d 51, 81

(Fed. Cir. 2012) (referring to the "infringing" optical disk drives in a case concerning induced infringement of a method patent).

Additionally, Appellants' temporal analysis is erroneous. Appellants apparently contend that the Commission's violation determination was based on a hypothetical that "the imported products *may* later be combined with other things and then used to infringe a method claim." Blue En Banc Br. at 38. The Commission did *not* institute this investigation based on a complaint that Appellants had imported staple devices that might later be used to infringe. Rather, the complaint contained evidence that direct infringement of the '344 patent was *ongoing* in the United States (the only place where direct infringement can occur, *see* 35 U.S.C. § 271(a)), and evidence that the accused articles were being imported to induce that infringement. A100024-25. That evidence was substantiated in the investigation, as reviewed below.

In 2008, well before the complaint was filed in 2011, Suprema researched Cross Match's patents. A400573-74; A200330. Suprema then obtained Cross Match's products to "use as a reference" in designing its scanners. A400600. By February 2009, [[

]]. A400598. Notwithstanding the known risk of infringement, in June 2009 Suprema began inducing Mentalix to integrate Suprema devices with Mentalix software [[

]]. A303162-74. Mentalix responded to Suprema's overtures by stating that [[ ]]." A303172. [[ ]]. A303167.

From the beginning, Suprema and Mentalix collaborated to [[ ]]." A303172. The two companies discussed [[ ]]. A303165-66. When Mentalix asked about [[ ]]. A303169. Then Suprema [[ ]] in furtherance of the scheme. A303163-65. Mentalix performed fingerprint segmentation tests and demonstrations using Suprema scanners and the FedSubmit software. A200312-13; A400638-39. By the time the complaint was filed, Mentalix had [[ ]]. A400759-62; A401373. Mentalix had also induced customers to use the imported Suprema scanners to perform fingerprint segmentation. A400639. As explained later in this brief, when Mentalix and its customers used the FedSubmit software with Suprema's scanners, they directly infringed claim 19.

The evidence above shows Suprema imported scanners into the United States with the intent of inducing Mentalix to perform fingerprint segmentation, and Mentalix imported scanners with the intent of inducing its customers to perform the same process. As explained in more detail in the following section of this brief, Suprema knew of the high risk that these activities would infringe Cross Match patents, but Suprema willfully blinded itself to knowledge of the infringement. A400578; A400598; A400603 at 305:4-8.

The foregoing facts are condemning, and so it appears that Appellants would prefer that the Court adjudicate a hypothetical scenario instead. Appellants essentially ask the Court to imagine the very first scanner Appellants imported, a scanner sitting in a shipping container at a U.S. port that had not yet been combined with Mentalix software. If the Court were to stop the clock at that moment, Appellants contend, there would have been no direct infringement of claim 19, no inducement, and no importation of articles that infringe. But that is not the case before the Court. The Commission's determination was based on a record that showed direct infringement of claim 19 in the United States several months before the complaint was filed. A200312-13; A400638-39; A401379-80. For months Appellants were intentionally importing and selling scanners to induce performance of the method covered by claim 19, and that method was in fact being

performed. A400759-62; A400639. Those unfair trade practices were "found by the Commission to exist." *See* 19 U.S.C. § 1337(a). They were not hypothetical.

### C. The Commission's Willful Blindness Determination Is Correct

As discussed in section II.A.2. above, liability for inducement of infringement requires an intent on the part of the accused to cause direct infringement of a patent. *See DSU Med. Corp*., 471 F.3d at 1306. Appellants concede that under the Supreme Court's decision in *Global-Tech* willful blindness may be invoked as a substitute for the intent showing. Blue En Banc Br. at 23, 54-55. The Commission applied the *Global-Tech* willful blindness standard when it determined that Suprema induced direct infringement by Mentalix. A000224. As discussed in this section, substantial evidence supports the Commission's determination.

Suprema's conduct closely tracks the conduct of the willfully blind defendant in *Global-Tech*. The defendant in *Global-Tech* "performed 'market research' and 'gather[ed] information as much as possible'" about the patented article. 131 S. Ct. at 2071. Suprema similarly studied the specifications and functions of the products on Cross Match's website (A400544); acquired Cross Match scanners (*id*.); acquired Cross Match executable code in a software development kit ("SDK") (A400546); and conducted tests to understand the functions of Cross Match's scanners (A400593; A400600).

In *Global-Tech*, the evidence showed the defendant "copied" the patented articles. 131 S. Ct. at 2071. In the present case, a Suprema executive testified that Suprema used Cross Match's scanners "as a reference" in the design of Suprema's products. A400600.

The defendant in *Global-Tech* failed to inform outside patent counsel of information that was material to a right-to-use opinion, namely that the product at issue was a knockoff of a patented article. 131 S. Ct. at 2071. Similarly, Suprema [[

]]. Specifically, Suprema discovered Cross Match's '562 patent, which disclosed the application that matured into the infringed '344 patent. A400573. [[

]]. A400598.

Because the Commission correctly applied *Global-Tech*—the law that Appellants concede is appropriate—the only question on appeal should be whether the Commission's willful blindness determination is supported by substantial evidence. *See Warner Bros., Inc. v. U.S. Int'l Trade Comm'n*, 787 F.2d 562, 563 (Fed. Cir. 1986) (affirming the Commission "[b]ecause the ITC applied the correct legal standard" and the determination was supported by substantial evidence). Nevertheless, Appellants attempt to manufacture legal issues on appeal to obtain less deferential review. As explained below, Appellants' arguments have no merit.

### 1. Failing to Investigate a Known Risk Is a Deliberate Action to Avoid Knowledge

First, Appellants contend that the Commission "wrongly focused on *inaction* by Suprema" instead of "deliberate action" taken to avoid knowledge of the '344 patent. Blue En Banc Br. at 55-56. Appellants' argument has been soundly rejected by a number of courts. The *Global-Tech* court adopted its willful blindness standard for patent cases from criminal law developed in the regional circuits. *Global-Tech,* 131 S. Ct. at 2068-71. The Supreme Court cited the Seventh Circuit's decision in *United States v. Draves* as one example of the willful blindness doctrine. *Global-Tech*, 131 S. Ct. at 2070 n.9 (citing *United States v. Draves,* 103 F.3d 1328, 1334 (7th Cir. 1997)). In *Draves* the court held that a defendant's deliberate effort to avoid guilty knowledge may be "purely psychological avoidance," such as "a cutting off of one's normal curiosity by an effort of will." 103 F.3d at 1334.

Here, the record shows Suprema engaged in deliberate psychological avoidance of knowledge that would confirm infringement. As Appellants admit, Suprema studied Cross Match's products and knew that those products were protected by patents. Blue En Banc Br. at 56-57. Mr. Song, an executive at

Suprema,[10] searched for the words "Cross Match" on Google's patent site. A400573-74; A200330. Mr. Song admitted his search returned at least two Cross Match patents, the '562 and '932 patents. *Id*. Each listed "Cross Match Technologies, Inc." in the assignee field. A000303; A400712. The Commission found that Mr. Song's key word search likely would have also returned the '344 patent, which identically contains "Cross Match Technologies, Inc." in the assignee field. A000223; A000265. Despite that fact, Mr. Song never explained why he did not review the infringed '344 patent as he searched patents containing the words "Cross Match" over several days. *See* A400573-74. Mr. Song's selective review of patents containing the words "Cross Match" is a first instance of "psychological avoidance" supporting the Commission's willful blindness determination. *See United States v. Stone*, 987 F.2d 469, 472 (7th Cir. 1993).

The record also contains evidence that Mr. Song intentionally cut off his normal curiosity when he read the Cross Match '562 patent. Appellants do not dispute that the '562 patent disclosed the application that led to the infringed '344 patent at least five times. *See* A000305 (listing published application no. 2003/0142856); A000316 at 1:11-14 (incorporating application no. 10/345,420 by reference); A000318 at 5:33, 40, 64). Appellants claim that Mr. Song was unaware

[10] Mr. Song testified his position is "executive vice president in the R&D center in charge of the R&D activities." A200328.

of these reiterations because he "read no further than the abstract" of the '562 patent. Blue En Banc Br. at 18.

The record shows Mr. Song had actual knowledge that [[

]]. After he found the '562 patent, Mr. Song

[[

]]."

A400578 (emphasis added).[11] But still Mr. Song stopped himself from reading beyond the end of the '562 patent abstract. Blue En Banc Br. at 18.

The record belies Appellants' argument that Mr. Song stopped reading because the '562 abstract informed him the patent was irrelevant to Suprema's devices. The following chart compares infringed claim 19 of the '344 patent to disclosures in the '562 abstract:

| '344 Patent, Claim 19 | '562 Patent, Abstract |
|---|---|
| 19. A method for capturing and processing a fingerprint image, the method comprising: | "A method of reliably capturing biometric print images includes" |
| (a) scanning one or more fingers; | (a) "a scanned image" |
| (b) capturing data representing a corresponding fingerprint image; | (b) "capturing biometric print images"; |

[11] [

]]." A400664 (emphasis added).

| | |
|---|---|
| (c) filtering the fingerprint image; | (c) "filtering the scanned image"; |
| (d) binarizing the filtered fingerprint image; | (d) "binarizing the filtered image"; |
| (e) detecting a fingerprint area based on a concentration of black pixels in the binarized fingerprint image; | (e) "detecting print area"; |
| (f) detecting a fingerprint shape based on an arrangement of the concentrated black pixels in an oval-like shape in the binarized fingerprint image; and | (f) "detecting . . . print shape"; and |
| (g) determining whether the detected fingerprint area and shape are of an acceptable quality. | (g) "determining the print quality of a scanned image." |

A000297; A000303 at Abstract.

Notwithstanding the correlation between the '562 abstract and the infringing products Suprema developed with Mentalix, Mr. Song stopped himself from reading the '562 patent beyond the abstract. He knew [[ ]]." A303065. Mr. Song engaged in deliberate, culpable psychological avoidance.

### 2. The Commission Appropriately Examined Suprema's Failure to Consult with Outside Counsel among Other Circumstances

Appellants contend that the Commission erred by considering Suprema's failure to obtain an opinion of counsel in its willful blindness analysis, noting that *In re Seagate Technologies* eliminated "an affirmative duty to obtain an opinion of

counsel." *See* Blue En Banc Br. at 59 (citing *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc)). Appellants' statement of the law is inapt.[12]

*Seagate* concerned the legal standard for determining willful infringement. 497 F.3d at 1371. This Court has distinguished *Seagate's* willful infringement analysis from the inducement inquiry, the issue in this appeal. *See Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 699 (Fed. Cir. 2008). For inducement of infringement, a fact finder may consider "all of the circumstances," including "opinion-of-counsel evidence," when determining the intent of the accused inducer. *Id*. at 699-700. This is true even when the infringement finding is based on willful blindness, as shown by the facts and law of *Global-Tech*. There, the Supreme Court explained that "courts applying the doctrine of willful blindness hold that defendants cannot escape the reach of these statutes by deliberately shielding themselves from clear evidence of critical facts that are strongly suggested *by the circumstances*." *Global-Tech*, 131 S. Ct. at 2068-69 (emphasis added). The Court specifically noted the circumstances surrounding the

[12] The newly enacted provisions regarding opinion of counsel evidence found in 35 U.S.C. § 298 do not apply to this case as the investigation at issue was instituted on June 17, 2010, well before the effective date of those provisions. *See* Patent Law Treaties Implementation Act of 2012, Pub. L. No. 112-211, § 1(a) (enacted Dec. 18, 2012).

defendant's communication with outside patent counsel. *Id.* at 2071-72. The Court affirmed consideration of this evidence by the fact finder. *Id.*

Appellants have failed to inform this Court of the circumstances surrounding [[ ]]. That evidence is reviewed below.

In the spring of 2008, [[ ]]. A400751; A400576. [[ ]], Mr. Song cut off his curiosity. A400585. [[ ]]. A400603 at 305:4-8. Mr. Song's failure to [[ ]] supports a finding of willful blindness. *See United States v. Stadtmauer*, 620 F.3d 238, 259 (3rd Cir. 2010) (willful blindness could be found where defendant deliberately avoided "ask[ing] the natural follow-up question[s]") (case cited in *Global-Tech*, 131 S. Ct. at 2070 n.9).

Later Mr. Song learned [[ ]]. A400598; A400603. In response, Mr. Song [[ ]] (A400603 at 305:4-8). Mr. Song's failure to

CONFIDENTIAL BUSINESS INFORMATION DELETED

inquire further after learning [[

]], *see* A400598) supports a finding of willful blindness. *See United States v. Freeman*, 434 F.3d 369, 378 (5th Cir. 2005) ("a failure to conduct further inquiry" once suspicions are raised "justifies an inference of deliberate indifference"); *United States v. Florez*, 368 F.3d 1042, 1044-45 (8th Cir. 2004) (affirming willful blindness where defendant "chose not to investigate and effectively buried her head in the sand").[13] The Commission did not err.

### 3. The Commission Did Not Apply a Negligence Standard

Appellants argue that the Commission applied "what is at most a negligence standard, *i.e.*, that Suprema *should have* found the '344 patent." Blue En Banc Br. at 54. Appellants are incorrect. Appellants provide no citation for the Commission's supposed holding that Suprema was under a duty to identify the '344 patent because the Commission's opinion contains no such statement. The Commission stated:

> Despite the knowledge that Cross Match had multiple patents in the biometric scanning field, Suprema asserts that it did not check to see if the related patent application referenced in the '562 patent had ever matured into an issued patent. Suprema's deliberate avoidance of acquiring knowledge of the '344 patent is further shown by its failure to obtain the opinion of counsel. Such an opinion undoubtedly would have uncovered the '344 patent, the fact that both the '344 and '562 patents are assigned to Cross

---

[13] The Supreme Court cited *Freeman* and *Florez* in its formulation of the willful blindness standard in *Global-Tech*. *See* 131 S. Ct. at 2070 n.9.

> Match, and would have analyzed whether Suprema infringed any of the Cross Match patents.

A000224 (citations and underline omitted).

The Commission's determination was *not* that Suprema merely failed to behave as a reasonable person (*i.e.*, was negligent) but rather that Suprema, aware of a high risk of infringement, intentionally avoided learning of that infringement. As one court explained, such an analysis inherently forecloses a negligence determination. "By definition, one who intentionally avoids learning of" his legal obligations is not one who fails to follow the law as a result of an "innocent error[ ] made despite the exercise of reasonable care." *See Stadtmauer*, 620 F.3d at 256 (quoting *Cheek v. United States*, 498 U.S. 192, 205 (1991)).[14] The Commission did not err.

### D. The Commission Correctly Construed Claim 19

In disputing direct infringement of the '344 patent, Appellants limit their arguments to two limitations in claim 19. Those limitations are the following:

> (e) detecting a fingerprint area based on a concentration of black pixels in the binarized fingerprint image;
>
> (f) detecting a fingerprint shape based on an arrangement of the concentrated black pixels in an oval-like shape in the binarized fingerprint image;

[14] The Supreme Court cited *Stadtmauer* in its formulation of the willful blindness standard in *Global-Tech*. *See* 131 S. Ct. at 2070 n.9.

Blue En Banc Br. at 62 (quoting A000297).

### 1. "Detecting a Fingerprint Area" Does Not Require a Mathematical Calculation of Area

Appellants contend that the claim step of "detecting a fingerprint area" requires a mathematical calculation of the two-dimensional area (*e.g.*, base multiplied by height) covered by black pixels in a fingerprint image. Blue Panel Br. at 35. Appellants' construction is at odds with the words of the claim and the patent specification.

"[T]he words of a claim 'are generally given their ordinary and customary meaning.'" *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The Commission gave the words "detecting a fingerprint area" their ordinary meaning, as Appellants agreed the Commission should.[15] A000128. To "detect" ordinarily means to discover the presence of something.[16] The primary definition of "area" is a part of a place or object.[17] Thus, in the context of claim 19, the plain meaning of "detecting a fingerprint area" is to discover the presence

[15] The fact that the Commission adopted Appellants' plain meaning construction is another reason the Commission's construction should be affirmed. *See Tessera, Inc. v. Int'l Trade Comm'n*, 646 F.3d 1357, 1364 (Fed. Cir. 2011) (where "the Commission adopted [appellant's] proposed claim construction," that construction cannot be challenged on appeal).

[16] Detect. Oxford Large Print Dictionary, 280 (Oxford University Press 2002).

[17] Area. Oxford Large Print Dictionary, 46 (Oxford University Press 2002).

of a part of an image having a fingerprint; it does not require a mathematical computation of the area covered by the fingerprint.

The Commission's construction is also consistent with the '344 patent specification. *See Phillips*, 415 F.3d at 1303 (the specification is "the single best guide to the meaning of a disputed term"). The relevant disclosure of "detecting a fingerprint shape" in the specification is as follows:

> In step 708, a fingerprint area is detected. Usually, the black areas of the image are concentrated around the fingerprints. Thus, the detection step detects the areas concentrated by black pixels.

A000295 at 15:43-46. The "area" detected by the invention in the specification is a region "concentrated by black pixels." The teachings in the specification are therefore consistent with the plain meaning of "area" as connoting a section within the digital image. Nowhere does the specification teach that detecting an area means a two-dimensional mathematical calculation, as Appellants suggest. Appellants' claim construction argument should be rejected.

#### 2. "Detecting a Fingerprint Shape" Does Not Require a Mathematical Calculation of an Oval

Element (f) of claim 19 requires:

> (f) detecting a fingerprint shape based on an arrangement of the concentrated black pixels in an oval-like shape in the binarized fingerprint image;

A000297.

While the plain language of element (f) requires "detecting a *fingerprint* shape," Appellants argue that element (f) requires detecting an *oval-like* shape. Blue Panel Br. at 40-41 (emphasis added). As explained below, Appellants' construction is contrary to the words of the claim and the teachings of the patent specification.

The Commission determined that element (f) "does not require a calculation or determination of whether anything is oval-like." A000131. The Commission's construction is faithful to the words of claim 19. *See Phillips*, 415 F.3d at 1314 (the words of a claim "provide substantial guidance" in claim construction). The words of element (f) first identify *what* is to be detected and then identify *how* that detection is to be done. The *what* is a fingerprint shape, not an oval. The *how* is based on an arrangement of pixels. So long as an accused device detects a fingerprint shape and that detection is based on black pixels that exist in an oval-like shape, the accused device need not mathematically identify the fingerprint shape as an oval to satisfy the words of the claim.

The Commission's construction is also consistent with the '344 patent specification. *See Phillips*, 415 F.3d at 1303 (the specification is "the single best guide to the meaning of a disputed term"). The specification states that "[i]n step 710, fingerprint shapes are detected." A000295:15:43-49. The detected fingerprint shapes "*can be* oval-like shapes." *Id*. (emphasis added). The

specification therefore teaches that a fingerprint shape can be oval-like, but need not be. Moreover, Appellants identify no passage in the patent specification that requires the calculation of an oval, because none exists.

Neither the specification nor the claims require software recognition that the scanned fingerprint shapes are ovals. The Commission's construction is correct, and as explained next, Mentalix and its customers directly infringed claim 19 by using the FedSubmit software.

### E. Elements (e) and (f) of Claim 19 Read on the Method Performed by Mentalix Using the Accused Devices

Appellants claim that the ALJ erroneously found that "the creation of a bounding box" in the FedSubmit software meets limitations (e) and (f) of claim 19. Blue En Banc Br. at 62-63. But the ALJ never stated that merely drawing a bounding box around a fingerprint satisfied limitations (e) and (f). Instead, the ALJ stated that "the *process* of creating a bounding box" within the FedSubmit software satisfied the claim elements. A000131 (emphasis added). The ALJ cited testimony concerning the several processing functions involving in creating the bounding box, and found those functions satisfied the claim. *See, e.g.*, A000128. Appellants use the visual of the bounding box in their briefs as a red herring to distract the Court from the detailed functions relied upon by the ALJ. Nevertheless, Appellants concede, as they must, that the functions in the source

code cited by the ALJ are undisputed. Blue En Banc Br. at 62. Those source code functions are reviewed below.

### 1. The FedSubmit Software Has Functions for "Detecting a Fingerprint Area"

The ALJ described the functions within the FedSubmit software that practice the step of "detecting a fingerprint area." A000128. Within the FedSubmit source code, the function [[

]]. A401319; A200255. Then the function [[

]]." A200255. Appellants' expert conceded at trial that "in essence" this part of the process "looks for the blobs" in the fingerprint image to determine what parts are black and what parts are white. A200458. When the accused device "looks for the blobs" and "[[ ]]," it is "detecting a fingerprint area based on a concentration of black pixels in the binarized fingerprint image."

### 2. The FedSubmit Software Has Functions for "Detecting a Fingerprint Shape"

The ALJ described the functions within the FedSubmit software that meet the step of "detecting a fingerprint shape." A000128-31. After the function [[ ]]," the

FedSubmit software calls the function [[ ]]." A200255. [[ ]] detects the shape of that concentration. A200255-56. Moreover, Appellants do not dispute that the accused software detects "the top-most, bottom-most, left-most, and right-most black pixels" of a shape. Blue Panel Br. at 36. The only possible way to determine if a pixel is "the top-most" is to compare that pixel with all other edge pixels. Because the accused software admittedly "[[ ]]" and admittedly makes comparisons of how all edge pixels relate to each other, substantial evidence supports the Commission's determination that the software detects a fingerprint shape.

Additionally, it is undisputed that the concentrations of black pixels detected by the accused devices are generally oval shaped. A000131; A401278. The accused device therefore detects a fingerprint shape based on the presence of pixels arranged in an oval-like shape.

## III. Violation Based on Articles that Infringe the '993 Patent

The Commission directs the Court to its original panel brief for a discussion of the issues related to the '993 patent. The asserted claims of the '993 patent are all apparatus claims. Because importation of a patented apparatus is direct infringement, *see* 35 U.S.C. § 271(a), the '993 patent presents no inducement question. The original panel affirmed the Commission's determination of a

violation based on direct infringement of the ’993 patent. The Commission urges the en banc Court to reinstate the panel decision with respect to violation of the ’993 patent and affirm the Commission’s remedial orders for that violation.

## IV. The Commission’s Remedy Bears a Reasonable Relation to Appellants’ Violation and Should Be Affirmed

The Court gives the Commission broad discretion in fashioning its remedies. Where an exclusion order entered by the Commission bears a reasonable relation to the unlawful practices of respondents, the order should be affirmed. *See Ruberoid*, 343 U.S. at 473 (“the courts will not interfere [with an agency remedy] except where the remedy selected has no reasonable relation to the unlawful practices found to exist” (quoting *Jacob Siegel Co. v. Federal Trade Comm.*, 327 U.S. 608, 611 (1946)). As explained below, the Commission’s order meets that standard.

### A. History Shows Customs and the Commission Can Enforce This Exclusion Order

Appellants contend that Customs cannot enforce an order that prohibits articles that infringe under § 271(b) because Customs cannot tell by examining Suprema’s scanners whether they are being imported to induce infringement. Others have raised similar arguments about the enforcement of Commission orders by Customs and those arguments have been rejected. For example, in *Sealed Air Corp. v. U. S. Int’l Trade Comm’n*, 645 F.2d 976 (C.C.P.A. 1981), an appellant

challenged a Commission order excluding bubble wrap made by a patented process. *Id*. at 980-81. When entering the order, the Commission noted that Customs had "no way to distinguish, either visually or by laboratory testing, multicelluar plastic film manufactured by the patented process from film manufactured by noninfringing processes." *Certain Multicellular Plastic Film*, Inv. No. 337-TA-54, USITC Pub. No. 987, 1979 WL 442576, at *10 (June 12, 1979) (*Multicellular Plastic Film*). Accordingly, the Commission included in its exclusion order a provision that allowed any importer to "petition the Commission to institute further proceedings for the purpose of determining whether the film sought to be imported should be allowed entry into the United States." *Id*.

This court's predecessor affirmed the Commission's order, noting there was "no showing that the present ITC Order is in any way inconsistent with its mandate." *Sealed Air Corp*, 645 F.2d at 989. Given the Commission's expertise in areas of trade, the court stated, "it is not the function of a court to substitute a different remedy of its own design for that chosen by the ITC." *Id*. at 989.

This case is not unlike *Multicellular Plastic Film*. As in *Multicellular Plastic Film*, it is possible that, when enforcing the order in this case, Customs might not be able to determine whether future shipments of Suprema scanners presented for entry infringe claim 19 under § 271(b). However, as in *Multicellular Plastic Film*, the Commission's order provides a procedure for that circumstance:

an importer may certify to Customs that the goods do not infringe. A400502-03. This scheme has been successfully executed in dozens of exclusion orders. *See, e.g.*, *Certain Baseband Processor Chips*, Inv. No. 337-TA-543, USITC Pub. No. 4258, 2011 WL 6121182, at *9 (Oct. 1, 2011) (order entered based on evidence of articles imported to induce infringement), *remanded for further consideration of inducement in Kyocera*, 545 F.3d at 1353-54; *Certain Ground Fault Circuit Interrupters and Products Containing Same*, Inv. No. 337-TA-615, USITC Pub. No. 4146, Order, 2009 WL 962585, at *5 (March 9, 2009); *Certain Mems Devices and Products Containing Same*, Inv. No. 337-TA-700, USITC Pub. No. 4294, 2011 WL 7592771, at *5 (May 10, 2011).

Appellants complain that certification places too great a burden on the importer because "an importer might not itself know to what uses it will put the staple devices." Blue En Banc Br. at 53. Appellants' hypothetical strains credibility and bears no resemblance to the facts of this case. Here, Suprema used Cross Match's products as a reference when designing its products (A400600), knew about the high risk of infringing Cross Match's patents (A400578; A400598), colluded with Mentalix to produce a scanner that did fingerprint segmentation "on par with Cross Match" (A303172), and took deliberate action to avoid confirming that the resulting product would be used to infringe the '344 patent (A400585). [[ ]] were imported under

these circumstances. A400759-62; A401375. The exclusion order entered by the Commission bears a reasonable relation to these unlawful practices by the Appellants and should therefore be given deference. *See Ruberoid*, 343 U.S. at 473.

### B. Potential Noninfringing Uses Are Not a Sufficient Reason to Disturb the Exclusion Order Given Suprema's *Mens Rea*

Appellants argue that they should be allowed to import and sell scanners for use with noninfringing software. Blue En Banc Br. at 51. As explained in this section, the potential for using the scanners at issue in noninfringing ways is not a sufficient reason to disturb the Commission's order.

First, Appellants' argument that they cannot import scanners for noninfringing uses appears to be purely hypothetical. The Commission's exclusion order in this case was entered three years ago. During that time, the Commission has received no notice from Customs that it has denied entry of *any* Suprema scanners. Thus, it appears that any scanners certified as intended for noninfringing uses have *not* been denied entry.

Second, the Commission's order is specific to Suprema and Mentalix and their products. A400502. Additionally, the order only bars entry of biometic scanning devices "that infringe" the '344 and '933 patents. *Id*. The order does not prohibit articles that do not infringe. But even if the order incidentally were to curtail some noninfringing uses simultaneously with infringing uses, that would

not make the order *ultra vires*. This Court has noted "the old adage that 'those caught violating the [law] must expect some fencing in.'" *Spindelfabrik Suessen-Schurr v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 903 F.2d 1568, 1577 (Fed. Cir. 1990) (citing *Federal Tr. Comm'n v. Nat'l Lead Co*., 352 U.S. 419, 431 (1957)). The same principles apply in administrative remedies. An agency's remedial authority is "not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past." *Ruberoid*, 343 U.S. at 473. If the Commission is to attain the objectives Congress envisioned, "it cannot be required to confine its road block to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity." *Id.; see KPMG, LLP v. S.E.C*., 289 F.3d 109, 122 (D.C. Cir. 2002) (affirming a remedial order "preventing violations flowing from a broader array of [circumstances] than the precise ones found").

In appeals arising from both the district courts and the Commission, this Court and its predecessor have affirmed orders that stop the importation of even non-adjudicated products when the circumstances warranted that relief. *See Spindelfabrik Suessen-Schurr*, 903 F.2d at 1577-78 (contempt proceeding); *Sealed Air Corp.*, 645 F.2d at 988-89 (providing for additional adjudication). The order at issue here, which applies only to "biometric scanning devices…*that infringe*,"

(A400502) is less onerous than the orders affirmed in *Spindelfabrik* and *Sealed Air* and should be similarly affirmed.

Although scanners imported without an intent to infringe claim 19 would not be within the scope of the exclusion order, it is difficult to see how any future importation of Suprema scanners could be free from the taint of Appellants' proven *mens rea*. Appellants' culpable state of mind is now beyond dispute. This litigation has shown Appellants have actual knowledge of the '344 patent and actual knowledge that using Mentalix software on Suprema scanners to perform fingerprint segmentation directly infringes claim 19 of the '344 patent. Thus, the need for an order prohibiting articles that indirectly infringe claim 19 is now greater than ever. Given these facts, Appellants "must expect some fencing in," *Spindelfabrik Suessen-Schurr*, 903 F.2d at 1577 (internal quotations omitted), and the Commission's order should not be disturbed.

### C. Appellants Have Avenues of Recourse for Any Supposed Noninfringing Uses

If Appellants are unclear about whether a proposed action would violate the exclusion order, they may obtain an advisory opinion from the Commission about that conduct. 19 C.F.R. § 210.79. Similarly, Appellants may seek modification of the order if justified by changed circumstances. *Id*. at § 210.76. Courts have considered the availability of advice from the agency as a relevant factor in reviewing a remedial order. For example, in *KPMG, LLP v. S.E.C.*, the court noted

that if the appellant was "sincerely unable to determine whether a proposed course of action would violate the present order," the appellant could ask the agency to give "definitive advice as to whether [the] proposed action if pursued, would constitute compliance with the order." 289 F.3d at 124.

Like the order at issue in *KPMG, id*. at 123, the Commission order under review here "tracks the statutory language" of section 337. *Compare* A400502 (barring the importation of "biometric scanning devices . . . that infringe") *with* 19 U.S.C. § 1337(a)(1)(B)(i) (defining "[t]he importation…of articles that—infringe" as unlawful). Also as in *KPMG*, appellants may obtain an opinion from the Commission about a proposed course of action or changed circumstances. 19 C.F.R. §§ 210.76, 210.79. Thus, there is no need for the Court to redefine what constitutes a violation of section 337 or vacate the Commission's remedial orders to address Appellants' speculative concerns.

In the unlikely event the Court determines that the exclusion order at issue does not have adequate protections for noninfringing imports, the solution is *not* to redefine what constitutes a violation of section 337, as Appellants urge. Instead, the Court should remand the investigation to Commission so that the Commission can refine its order. As the Supreme Court has explained, "the function of the reviewing court ends when an error of law is laid bare. At that point the matter once more goes to the Commission for reconsideration." *FPC v. Idaho Power Co.*,

344 U.S. 17, 21 (1952). To do otherwise would risk "propel(ling) the court into the domain which Congress has set aside exclusively for the administrative agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

**CONCLUSION**

For the forgoing reasons, the Commission's determination of a violation of section 337 based on the importation of articles that infringe the '344 and '993 patents should be affirmed.

Respectfully submitted,

/s/ Clark S. Cheney
DOMINIC L. BIANCHI
General Counsel
WAYNE W. HERRINGTON
Assistant General Counsel
CLARK S. CHENEY
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
(202) 205-2661

## CERTIFICATE OF SERVICE

I, Clark S. Cheney, hereby certify on this 15th day of October, 2014, that true and correct copies of the attached **NON-CONFIDENTIAL EN BANC BRIEF OF APPELLEE INTERNATIONAL TRADE COMMISSION** were served upon the following via UPS:

**On behalf of Suprema, Inc. and Mentalix, Inc.:**

Darryl Michael Woo, Esq.,
**FENWICK & WEST, LLP**
555 California Street, 12th Floor
San Francisco, CA 94104
dwoo@fenwick.com

**On behalf Cross Match Technologies, Inc.:**

Maximilian A. Grant, Esq.,
**LATHAM & WATKINS LLP**
555 11th Street, NW, Suite 1000
Washington, DC 20004
max.grant@lw.com

**On behalf Nokia Corporation and Nokia USA, Inc.:**

John D. Haynes, Esq.
**ALSTON & BIRD LLP**
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309
john.haynes@alston.com

**On behalf American Intellectual Property Law Association:**

James Altman, Esq.
**FOSTER, MURPHY, ALTMAN & NICKEL, PC**
1899 L Street, NW, Suite 1150
Washington, DC 20036
jaltman@fostermurphy.com

**On behalf Intellectual Property Owners Association:**

J. Michael Jakes, Esq.
**FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP**
901 New York Avenue, NW
Washington, DC 20001
mike.jakes@finnegan.com

**On behalf Microsoft Corporation:**

Constantine L. Trela, Jr., Esq.
**SIDLEY AUSTIN LLP**
Bank One Plaza
1 South Dearborn Street
Chicago, IL 60603
ctrela@sidley.com

**On behalf Dell Inc., Adobe Systems, Inc., Ford Motor Co., Hewlett-Packard Co., LG Display Co., Ltd., LG Electronics, Inc., Netflix, Inc., Samsung Electronic Co., Ltd., SAP America, Inc.,:**

John Thorne, Esq.
**KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, PLLC**
Sumner Square
1615 M Street, NW
Washington, DC 20036
jthorne@khhte.com

**<u>On behalf Google, Inc.:</u>**

Daryl Joseffer, Esq.
**KING & SPALDING LLP**
1700 Pennsylvania Avenue, NW
Washington, DC 20006
djoseffer@kslaw.com

<u>/s/ Clark S. Cheney</u>
Clark S. Cheney
Attorney for Appellee
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-2661
Fax: (202) 205-3111
Clark.Cheney@usitc.gov

# CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 32(a)(7)(C)

Pursuant to Fed. R. Civ. P. 32(a)(7)(B), I hereby certify that the attached brief contains 13,942 words, according to the word-count function of the word-processing system used to prepare the brief (Microsoft Word 2010).

/s/ Clark S. Cheney
Clark S. Cheney

Date: October 15, 2014